UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Cherie Mealus | **NOTICE OF MOTION** - |
| Plaintiff | DEFENDANT RAFIZADEH'S |
| | MOTION FOR |
| | SUMMARY JUDGMENT |
| vs. | |
| Nirvana Spring Water, Inc. | Civil Action No: |
| Mansur Rafizadeh | 7:13-CV-0313 ( M A D / D E P ) |
| Defendants | |

**PLEASE TAKE NOTICE** that upon the accompanying declaration of Josiah Pertz, Esq., dated February 14, 2014, along with the attached Statement of Material Facts, exhibits and Memorandum of Law, Defendant Mansur Rafizadeh hereby intends to move this Court for an order granting summary judgment for Defendant pursuant to Fed. R. Civ. P. 56. The return date for the motion will be **March 18, 2014, 10:00am**, in Albany, New York.

Dated: February 14, 2014                                  Respectfully submitted,

                                                          *J. Pertz*

                                                          JOSIAH PERTZ, ESQ.
                                                          Attorney for Defendant Rafizadeh
                                                          Bar Roll: 603028
                                                          Pertz & Pertz, PLLC
                                                          12280 Route 365
                                                          Remsen, NY 13438
                                                          315-732-4900
                                                          Josiah.Pertz@gmail.com

TO:

Jesse C. Rose
Attorney for Plaintiff Cherie Mealus
Phillips & Associates, Attorneys At Law, PLLC
45 Broadway, Suite 620
New York, NY, 10006

Tel: 212-248-7431

ROBERT F. JULIAN, ESQ.
Attorney for Nirvana Spring Water, Inc.
Bar Roll: 601157
2037 Genesee St.
Utica, NY 13501
315-797-5610
Robert@rfjulian.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

Cherie Mealus

       Plaintiff

                        **DECLARATION OF**
                        **JOSIAH PERTZ, ESQ.**

                        Civil Action No:
                 7:13-CV-0313 ( M A D / D E P )

Nirvana Spring Water, Inc.
Mansur Rafizadeh

       Defendants

_____

**DECLARATION IN SUPPORT OF DEFENDANT RAFIZADEH'S
MOTION FOR SUMMARY JUDGMENT**

**JOSIAH PERTZ** declares the following to be true under penalty of perjury under 28 U.S.C. § 1746:

1.    I am an attorney duly licensed to practice law in the State of New York, and before the United States District Court for the Northern District of New York.

2.    I represent the Defendant Mansur Rafizadeh in the above-captioned matter, am familiar with the proceedings in this case, and present this declaration in support of Defendant Rafizadeh's motion for summary judgment.

**SUMMARY OF FACTS**

3.    In early February of 2012, Plaintiff Cherie Mealus gave notice to her supervisor, Jeanie Hellinger, that she would be leaving her employment with Defendant Nirvana for a better-paying job. (Ex. 2 and Ex. 3.) On February 7, she went for a pre-employment drug test and physical for the new employer. (Ex. 24.) On February 8, she learned that she would not be getting the job, and asked Hellinger for her job back. (Ex. 3.) She was told that her replacement had already been hired and that there was no job for her at Nirvana. She thereupon left the premises. (*Id.*)

4.    That night, in an email time stamped February 9, 2012, 3:49am, Plaintiff demanded a $5,000 payoff from Defendants, and if it was not paid, threatened to file this sexual harassment lawsuit and send pictures to Defendants' customers and regulators that she said would damage

their business. (Ex. 1). No witnesses saw Defendant Rafizadeh sexually harass Plaintiff, nor had any supervisor witnessed or reported any sexual harassment (Ex. 3). Plaintiff had sent multiple emails to the CEO of the company saying she loved her job, but just needed more money (Ex. 5). Multiple witnesses, including her own sister and mother (Ex. 3, Ex. 14), contradict key elements of Plaintiff's testimony. Plaintiff told her doctor, and alleges here, that Defendants' behavior made her nauseous and was the sole cause of that upset (Ex. 2 and Ex. 7), then contradicted herself on Facebook by saying a turbulent romantic relationship was making her throw up (Ex. 17).

5.   Plaintiff can provide no corroboration for her claims of sexual harassment. She claims to have been constructively discharged—having to quit because the harassment made her physically ill and, at that moment, she could no longer stand it—at precisely the time she had previously announced she would be leaving for a better job. Immediately thereafter, she stated in the February 9 e-mail that "[Defendant Mansur Rafizadeh] let me go today after almost 5 years of dedicated service. He kept a girl that has been there 1 day instead," acknowledging that she had not in fact been constructively discharged, but simply had not been re-hired after giving her notice.

6.   A full Statement of Material Facts is attached. Any passages cited in the Memorandum of Law that are not fully reproduced in the Statement are taken from the attached exhibits, with citations provided.

**EXHIBITS – TRUE AND ACCURATE COPIES OF AND/OR EXCERPTS FROM THE FOLLOWING DOCUMENTS**

7.   Exhibit 1 is an email sent by Plaintiff to Defendants on February 9, 2012.
8.   Exhibit 2 is Plaintiff's deposition, taken on October 15, 2013.
9.   Exhibit 3 is a series of affidavits from Nirvana employees.
10.   Exhibit 4 is a collection of emails Plaintiff sent to Defendants, containing pictures of water samples which Plaintiff claimed showed Defendants were shipping contaminated water to their customers.
11.   Exhibit 5 is a collection of Plaintiff's correspondence with Defendants during her employment at Nirvana.
12.   Exhibit 6 contains certificates of Plaintiff's prior convictions for DWI and aggravated harassment, relevant both as to her emotional state and her veracity on her medical records.
13.   Exhibit 7 is Plaintiff's complaint.
14.   Exhibit 8 is Defendants' Notice to Admit.
15.   Exhibit 9 is Plaintiff's Amended Response to Defendants' Notice to Admit.
16.   Exhibit 10 is the deposition of Heather Gorczyca, taken October 17, 2013.
17.   Exhibit 11 is Nirvana's Employee Handbook.
18.   Exhibit 12 contains medical records for Plaintiff.
19.   Exhibit 13 is the deposition of Mary Skiff, taken October 17, 2013.
20.   Exhibit 14 is the deposition of Plaintiff's sister, Julie Mealus Nellenback, taken December 19, 2013.
21.   Exhibit 15 is Plaintiff's EEOC charge, signed March 26, 2012.
22.   Exhibit 16 is the deposition of Kelly Flynn, taken December 19, 2013.

23.     Exhibit 17 is a collection of posts and messages from Plaintiff's Facebook account. The posts and messages were provided to us by Plaintiff's counsel following a download from Facebook, and are transcribed here in plain text. The HTML version is available on request.

24.     Exhibit 18 is the deposition of Alyssa Johnson, taken December 19, 2013.

25.     Exhibit 19 is a screen shot of a post Plaintiff made on Alyssa Johnson's Facebook wall, provided by Alyssa Johnson.

26.     Exhibit 20 contains selected pages from Plaintiff's application to work at Kraft Foods, provided by Kraft.

27.     Exhibit 21 is an email sent on March 21, 2012, from Plaintiff's account, to Plaintiff's counsel, and is apparently an edited version of Exhibit 1.

28.     Exhibit 22 contains selected material Plaintiff included in her application for unemployment, purporting to support her claim of sexual harassment at Nirvana. Upon information and belief, the text is copied from an email Plaintiff had sent to her counsel.

29.     Exhibit 23 is a letter from Plaintiff's counsel, listing Plaintiff's places of employment, and making other representations, pursuant to the order from Judge Peebles.

30.     Exhibit 24 contains Barrett Paving Materials Inc.'s records on Plaintiff, stemming from her application for employment in January of 2012.

31.     Exhibit 25 contains a letter from Plaintiff's counsel containing various representations as to Plaintiff and the discovery process.

32.     Exhibit 26 contains a letter from Defense counsel regarding discovery.

33.     Exhibit 27 contains a portion of an email exchange between Plaintiff and her counsel, provided to us by her counsel, from February 2012.

34.     Plaintiff's mother, Joyce Mealus, also gave a deposition in this case on February 4, 2013, the transcript of which is forthcoming.

WHEREFORE, Defendants respectfully request that this Court grant the motion for summary judgment.

                                        Respectfully submitted,

Dated: February 14, 2014                *J. Pertz*

                                        JOSIAH PERTZ, ESQ.
                                        Attorney for Defendant Rafizadeh
                                        Bar Roll: 603028
                                        Pertz & Pertz, PLLC
                                        12280 Route 365
                                        Remsen, NY 13438
                                        315-732-4900
                                        Josiah.Pertz@gmail.com

TO:

JESSE C. ROSE
Attorney for Plaintiff Cherie Mealus
Phillips & Associates, Attorneys At Law, PLLC
45 Broadway, Suite 620
New York, NY, 10006
Tel: 212-248-7431

ROBERT F. JULIAN, ESQ.
Attorney for Nirvana Spring Water, Inc.
Bar Roll: 601157
2037 Genesee St.
Utica, NY 13501
315-797-5610
Robert@rfjulian.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

Cherie Mealus

        Plaintiff

                                    **STATEMENT OF**
                                    **MATERIAL FACTS**

                                    Civil Action No:
                                  7:13-CV-0313 ( M A D / D E P )

Nirvana Spring Water, Inc.
Mansur Rafizadeh

        Defendants

_____

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(a)(3), in support of the accompanying Motion for Summary Judgment, Defendant Mansur Rafizadeh asserts the following material facts as to which there is no genuine issue:

**STATEMENT OF MATERIAL FACTS**

1.      Nirvana Spring Water N.Y. Inc. ("Nirvana") is a drinking water bottling company with its principal place of business in Forestport, New York. It employs roughly 130 people. Mozafar Rafizadeh, age 61, is the company's CEO and is in charge of the operations of the company. Defendant Mansur Rafizadeh, his 83-year-old brother, serves as the chairman of the board of directors.[1] Both men are immigrants to this country, having permanently left their native Iran following the revolution of 1979.

2.      Plaintiff Cherie Mealus was an employee at Nirvana from June 2004 through March 2005. She was rehired in March of 2008, laid off in the winter of 2009 and rehired in March of 2009. (Ex. 3, aff. of Jeanie Hellinger, p2, para. 6). With various interruptions, Plaintiff worked at Nirvana from then until February 8, 2012, for the most part assisting in laboratory testing of the water to ensure its quality. (*Id*., pp3-5.)

3.      Plaintiff sent multiple emails during her employment expressing how much she loved her job. (Ex. 5.) On several occasions she emailed Mozafar directly to ask for raises. In October 2011, Plaintiff wrote the following: "I really like working here and love the job that I do but

---

[1] Mansur and Mozafar Rafizadeh are referred to by their first names to avoid confusion.

$10.50 is just simply not enough to live on when trying to raise a teenager. Please consider a raise for me and if it is not something you can do at this time I will understand but will be forced to look for work elsewhere, which is something I really don' t want to do but I just really need to make a little more money than I am right now." (Ex. 5, p2.)

4.      While working at Nirvana, Plaintiff took on extra work bartending, working at the drinking establishments Club Central and Milk Plant Tavern during her off hours. (Ex. 17, p8, p10; Ex. 3, p6, para. 37). (Plaintiff did not disclose this additional employment, even when mandated by this Court to produce a complete list of her former employers since 2006. (Ex. 23.) At her deposition, she denied that the job at Club Central constituted employment, and said that "I just helped out tending bar once in a while." (Ex. 2, p252 ln 24-p253 ln 7.))

5.      Plaintiff in fact did begin to look for better-paying full-time work elsewhere. Barrett Paving Materials Inc. received Plaintiff's application for employment on January 19, 2012 (Ex. 24, p2). On February 3, 2012, Plaintiff advised her supervisor that she had obtained employment at Barrett Paving and would be leaving her job at Nirvana as of February 17, 2012. (Ex. 3. pp4-5, para. 23.) The job would carry better pay and a benefits package. (Ex. 2, p152, ln 11-15.) On February 6, 2012, Plaintiff advised her supervisor Jeanie Hellinger that she had to go for drug testing for her job at Barrett Paving the next day, February 7, and would have to leave work early that day for the test. Plaintiff left work on February 7 at about 12:30pm (Ex. 3, p5, para. 24) and Barrett Paving documented that she took a drug test that day (Ex. 24, p3).

6.      Upon receiving Plaintiff's notice, Nirvana hired someone to fill Plaintiff's spot (Ex. 3, p5, para 27). Plaintiff offered to assist in the training of the new hire, writing to her on Facebook on the morning of February 8, 2012: "Also I will be done at Barrett at 3:30 in the afternoon, I might see if they want me to come up a couple days and work with you for a few hours to make sure you are totally comfortable with it. the one problem they have is they rush people's training and I dont want to see that happen to you. Time for work :-)" (Ex. 17, p17).

7.      On February 8, 2012, in the early afternoon, Plaintiff received a phone call from Barrett Paving, informing her that they would not be hiring her after all. (Ex. 3, p5, para. 27.) Plaintiff would later explain the withdrawal of the employment offer in a Facebook message to a former Barrett employee with whom she had spoken after the interview: "You fuckin trouble making bitch...u told the other clerk how much I was gonna be making even tho I wasn't sure what the rate was for sure...now they aren't hiring me because of you...fuck you you dumb fuckin bitch.....go to hell!!!!" (Ex. 17, p16. See also Ex. 2, p154, ln 11-17.) Plaintiff confirmed this description of events in a different Facebook exchange, in which she demonstrated substantial agitation: "oh she is a fuckin cunt....its because of her i dont have that job. she told the other girl how much i was going to be making and then it got back to the office and they said it was a breech of confidentiality....missy did it, not me..Fuck that bitch." (Ex. 17, pp17-18).

8.      According to Jeanie Hellinger, when Plaintiff heard that Barrett would not be hiring her after all, Plaintiff went to Hellinger, distraught, and said she did not know what she was going to do. Hellinger told her that the job had already been filled. Hellinger told Plaintiff that Plaintiff could call Mansur directly, but that the decision on her replacement had been made: Plaintiff had given her notice, Nirvana had accepted, and had started training someone else. (Ex. 3, p5, para.

27.)

9.      According to Hellinger, Plaintiff said "I know, I know." She went next door to the office to call Mansur. She returned in about five minutes. She was screaming, cursing, slamming the door, collecting her belongings. She stated, "I've been here and they're giving my job to another girl." She collected her belongings and left. (Ex. 3, p5, para. 28.)

10.     Hellinger asked Plaintiff what Mansur had said, and according to Hellinger, Plaintiff said Mansur had told her that she had given her notice, that the job had been filled, and that "this is not a kindergarten." Hellinger reports that Plaintiff said nothing else about Mansur's statements or actions. (Ex. 3, p5, para. 29.) Hellinger testified that she spoke with Mansur shortly afterward, and he gave the same report about the conversation, stating that Plaintiff had been begging for her job back. (Ex. 3, p5, para. 30.)

11.     That evening, Plaintiff exchanged Facebook messages with the person whom she blamed for the loss of her job opportunity with Barrett, and the topic of sexual harassment appeared for the first time in Plaintiff's private correspondence:

> Melissa Houck Hirsch Wednesday, February 8, 2012 at 7:04pm EST
> Well from wat I understand if u hadn't lied to her things might have turned out differently .. just saying
>
> Cherie Mealus Wednesday, February 8, 2012 at 7:08pm EST
> and if u hadnt fucked the boss then accused him of sexual harrassment then stole money from the place things would have turned out duifferent...just sayin
> (Ex. 17, p16.)

12.     As the evening of February 8 wore on, Plaintiff began composing an email to Defendants. She chose her words over the course of several hours. (Ex. 2, p161, ln 3-5.) The email was delivered on February 9, 2012, at 3:49am. (Ex. 1.) Plaintiff admits having written and sent the email, reproduced in Exhibit 2. (Ex. 9, p2; Ex. 2, pp161-62.) Plaintiff began the email by recapping her impression of how she left her employment: "Mansur let me go today after almost 5 years of dedicated service. He kept a girl that has been there 1 day instead." (Ex. 1, p2.)

13.     The email then goes on to issue a series of threats against Defendants. Plaintiff demanded a payoff of $5,000 within one week. (Ex. 1, p3.) She warned Nirvana not to contest her application for unemployment. (*Id.*) If her conditions were not met, Plaintiff threatened two retaliatory actions. First, she threatened to file a sexual harassment lawsuit, and she listed several allegations about Mansur which she alleged constituted sexual harassment. (*Id.*, pp2-3.) Second, she threatened to send pictures depicting laboratory tests showing that Nirvana's water was contaminated with coliform to "all the companies you bottle water for and all the state health departments." (*Id.*, p3.)

14.     Before leveling her allegations of sexual harassment, Plaintiff claimed to "have contacted a lawyer concerning the way I was treated while there…" (Ex. 1, p2.) She admonished that her "lawyer is prepared to sue for way more than 5000…" (*Id.*, p3.) And she ended her email by

declaring, "My lawyer advised me to send you this email as my one and only attempt to end this quickly and quietly and without a lawsuit." (*Id.*) Plaintiff admitted under oath that this was all a lie: "Q. You did not at that time have a lawyer, as far as you knew you had no lawyer at all? A. At that time, no. Q. You had not retained a lawyer? A. Not at that time. Q. And no lawyer had said he was prepared to handle a lawsuit on your behalf, correct? A. Correct." (Ex. 2, p164 ln 24-p165 ln 6.)

15.     Plaintiff emailed dozens of pictures of the dirty water samples to Defendants the next morning. (Ex. 4, pp3-29.)

16.     Evidence suggests that Plaintiff's plan to extort money from Defendants using pictures of dirty water samples was premeditated. During her employment, several of Plaintiff's colleagues at Nirvana had witnessed her taking photos of water samples from the lab that showed contamination. (Ex. 3, aff. of George Zehr, p. 16, para. 8; aff. of Francis Wilbert Rocker III, p11, para. 23; aff. of Leo Hellinger, p21, para. 19). According to Plaintiff's supervisor Leo Hellinger, "She said, in substance. If anything happened, if I got fired or if I needed a job later, this would be an insurance policy to get back in. She said I have a relative to whom I could show this and have this place shut down." (Ex. 3, aff. of Leo Hellinger, p21, para. 19). Plaintiff's explanation at her deposition was not inconsistent with her coworkers' statements: "Q. What did you intend when you took the photos to do about the photos? A. I hadn't decided. Q. What motivated you to take the pictures? A. Because the water is disgusting. Q. Right. But why was it important to you to document that in the photos? A. I just wanted to have it handy. Q. In case what? A. In case I needed it. Q. For what? A. Someone has got to shut that place down." (Ex. 2, p178, ln 1-12.)

17.     Plaintiff never reported the supposedly dirty water to anyone outside her immediate family and close friends. (Ex. 2, p172, ln 8-19.)

18.     Nirvana's water is constantly tested and monitored for safety, both by our internal Quality Control staff and by external authorities, namely the Mohawk Valley Water Authority and the New York State Department of Health. Water is tested at different points in the bottling process. Tests include measures of yeast, coliform, ozone, total dissolved solids, turbidity and clarity. Samples of shipped water are dated and maintained in storage for years, in case a retesting of a particular date is necessary. Never has a shipped product been anything but absolutely safe for human consumption. (Ex. 3, p6.)

19.     Plaintiff filed a complaint with the EEOC on March 26, 2012. (Ex. 15.) Having received permission to sue, she brought this action on March 19, 2013. (Ex. 7.) Plaintiff claims sexual harassment discrimination (hostile work environment; no quid pro quo is pled), retaliation and aiding/abetting under N.Y. EXEC. § 296 et seq. (the "NYSHRL"), along with common law assault and battery. (*Id.*)

20.     Through her complaint (Ex. 7) and EEOC charge (Ex. 15), Plaintiff alleged that Mansur's behavior included the following:

>  i. asking Plaintiff to go on a trip to New York City in or about Fall 2009 (Ex. 7, p8, para. 35)

    ii. asking Plaintiff out to dinner (*id*., para 38)
    iii. taking Plaintiff to dinner around Easter 2010 (*id.* para 37)
    iv. giving Plaintiff $20 (*id.,* p6, para. 20)
    v. asking Plaintiff to lay down on the bed so that he could feel her stomach as she was breathing on or about December 12, 2009 (*id.*, p7, para. 31)
    vi. grabbing Plaintiff's arm and saying, "do you like to suck it?" (*id.*, p6, para. 24)
    vii. touching Plaintiff's lower back, hand, and arm (daily) (*id.,* p7, para. 29)
    viii. touching Plaintiff's stomach and telling her to breathe while lying down on a bed (*id.*, p7, para. 31)
    ix. making Plaintiff walk around the office with him and brushing up against her as they walked (daily) (*id.,* p7, para. 29)
    x. requesting that Plaintiff pick up an item on the floor, which Plaintiff inferred meant that he was looking at her buttocks (Ex. 15, p6, para. 22)
    xi. handing Plaintiff trash to throw away even if he was standing next to a trash can (Ex. 7, p7, para. 29)
    xii. calling Plaintiff stupid, bum and lazy (*id.*, p8, para. 33)
    xiii. meeting Plaintiff in the room he used as both an office and a bedroom (*id.*, p7, para. 32)
    xiv. having the top button of his pants unfastened while in his office (*id.*, p7, para. 32)
    xv. saying "[they] aren't worth it." ("[they]" allegedly refers to women but it is unclear where the original quote is allegedly from) (*id.*, p9, para. 44)
    xvi. telling an unspecified joke about a man who put cigars up his anus (*id.*, p9, para. 42)
    xvii. telling a co-worker, "my dog wants to eat you, and so do I." (*id.*, p10, para. 49)
    xviii. asking Plaintiff to take rides to the spring houses (*id.*, p9, para. 39)
    xix. making unspecified sexual advances to female employees (*id.*, p10, para. 48)
    xx. coming within inches of Plaintiff's face and screaming regarding purported work defects (*id.*, p9, para. 46)
    xxi. yelling at Plaintiff for leaving a book on a counter in the lab in February of 2012 (*id.*, p10, para. 51)

21. In addition, Plaintiff alleged that unnamed coworkers said, "Mansur will give you a hundred bucks if you suck it" and "Do you like to suck it?" She also alleged that coworkers would use the nickname "Boobs" with Plaintiff.

22. Of the incidents alleged, Plaintiff has only alleged time-stamps for a few of them (each is indicated in the appropriate entry in paragraph 20).

23. Plaintiff swore under oath that her complaint and EEOC charged contained the full extent of her allegations against Defendants: "Q. Okay. In terms of what Mansur Rafizadeh and Nirvana did, [do the two documents together] give us a complete picture? A. Yes." (Ex. 2, p121 ln 3-5.)

24.     According to Plaintiff's testimony, she failed to mention this alleged conduct while she worked at Nirvana. "Q. Did you tell anybody while you were working there what you say was happening to you there? A. No. Q. Did you tell anybody apart from the mention you just made about I think you mentioned to your sister that you had some emotional issues, did you tell anyone else that you had emotional issues specifically related to your employment at Nirvana? A. No." (Ex. 2, p24, ln 12-25.) Later in the deposition, Plaintiff contradicted her statements. She said, "I told one of the supervisors of one instance," allegedly telling her supervisor George Zehr that Mansur had asked her "if I like to suck it." (Ex. 2, p26, ln13-24). George Zehr's sworn statement affirms to the contrary. (Ex. 3, p16, para. 9-10). Plaintiff also claims to have told her supervisor Jeannie Hellinger that Mansur went out to dinner with her. (Ex. 2, p27, ln 5-13). According to Jeannie Hellinger's sworn statement, no such conversation took place. (Ex. 3, p4, para. 19-21).

25.     Plaintiff proffered her close friend Heather Gorczyca as a witness to the alleged conduct of Defendant. Ms. Gorczyca witnessed the following: "I was sitting on the floor painting the grates, and Mansur would always - you know - take a tour of the plant with whoever was in the lab. Well, that was just something he does. And Cherie would walk a little bit ahead, and he was just trying to rub her arm, grabbing her elbow or her shoulder, stuff like that." (Ex. 10, p62, ln 18-24). "Q. Did you observe her try to scooch away from him a little or -- A. No, not that I recall." (Ex. 10, p64, ln 22-24). "Q. Was that -- that was the only time you were -- A. That I've actually witnesses anything. Q. That you actually witnessed anything? A. Yes." (Ex. 10, p63, ln 11-14). Gorczyca is, as both of them describe it, Plaintiff's "BFF." (Ex. 17, pp21-22). They have been friends for 20 years (Ex. 2, p10, ln 19-22). Plaintiff visited Gorczyca in jail. (Ex. 2, p249 ln 25-p250 ln 1).

26.     No other witness has offered testimony about the conduct Plaintiff alleges of Mansur.

27.     Plaintiff has also identified a nurse, Mary Skiff, as a witness to her having sought treatment for emotional injury. (Ex. 2, pp12-13.) Mary Skiff testified that Plaintiff made no complaint of emotional injury to her prior to leaving Nirvana (Ex. 13, p14 ln 19-24). Skiff also confirmed that the substance of Plaintiff's complaint is that contained in her medical record. (Ex. 13, p14, ln 11-14; Ex. 12, p15).

28.     During her employment at Nirvana, Plaintiff made several visits to the doctor. (Ex. 12.) Medical records show visits on 4/15/09, 3/18/10, 12/22/10, 5/17/11, and 11/29/11. (*Id.*). Plaintiff sought treatment for various conditions, largely stemming from her asthma and tobacco use. At no point during her employment did she complain of nausea, vomiting, or emotional distress. She never mentioned sexual harassment to any medical professional during her time of employment. (*Id.*).

29.     Yet on March 7, 2012, Plaintiff sought out a doctor and claimed to have vomited every day for six months, after most meals and sometimes in between. (*Id.*, p15). At her visit a mere three and a half months earlier, Plaintiff did not report these symptoms. (*Id.*, p11). Her weight barely changed: in November of 2011 she weighed 205 pounds (*Id.*, p11) and in March of 2012 she weighed 202 pounds (*Id.*, p15). The record in March recites the patient's description that the

patient "has had increased depression, anxiety and nervousness *since resigning* from her job due to sexual harassment." (*Id.*) (emphasis added). Again in the history section, the doctor wrote, "her mood *since* [quitting] has been low…." (*Id.*, p17) (emphasis added). At no point does any medical record indicate that Plaintiff suffered any symptoms of depression or anxiety *during* her employment at Nirvana. Based on her complaints, the doctor wrote Plaintiff a prescription for anti-anxiety medication, including Lexapro. (*Id.*, pp18-19.)

30.     Plaintiff attributed her stress and weight change not to her employment but to this lawsuit: "Q. Sure. Firstly, during the period that you worked at Nirvana, did your weight change substantially from the beginning to the end? A. No, I don't believe so. Q. All right. So if there was some weight change, is that a weight change that occurred after you left? A. Yes. Q. And do you attribute that somehow to what was done to you at Nirvana? A. I attribute it to a lot of stress. Q. And what's causing you stress now? A. This whole thing. Q. This lawsuit? A. Yes." (Ex. 2, p230, ln 9-22.)

31.     Plaintiff's complaint stated the following: "Defendant RAFIZADEH's consistent unwanted sexual advances became so frequent and offensive that they were making Plaintiff MEALUS physically ill on a daily basis." (Ex. 7, p9, para. 40.) She alleged that Defendants' conduct was the sole cause of her alleged illness. "Q. Okay. Apart from issues at Nirvana, were other things going on at that time that had an impact on your emotional condition? A. No. Nope." (Ex. 2, p65, ln 8-11.)

32.     In comparison, Plaintiff wrote the following on Facebook a few days after ending work at Nirvana: "This might be TMI but I must share...I went out with a guy for almost 6 months and for over 4 of those his months his ex caused utter chaos in our lives and he let it happen and I was so upset that I got sick every day for 4 months...well I ended it a little over a week ago and today for the first day in 4 months I did not throw up!!! YAY ME!!!!!" (Ex. 17, p13). In July of 2012, Plaintiff had categorized this relationship as a "10 month long nightmare." (Ex. 17, p23.)

33.     Plaintiff has alleged that she took Lexapro, even though she had no prescription, during 2010-12 in order to deal with emotional conditions (Ex. 2., p54). (She had also taken Lexapro for emotional conditions prior to her most recent stint at Nirvana (*id.* p45 ln 20-p46 ln 11).) Plaintiff testified that she illegally obtained Lexapro from her mother, as her mother had a prescription for it and health insurance, which Plaintiff did not (*id.*, pp58-59). Plaintiff claimed to have given her mother money for the Lexapro (*id.*).

34.     Plaintiff's mother testified that this was false, and that she had never given Lexapro to Plaintiff, never shared her prescription with her, never took money from her for Lexapro. (February 4, 2014 deposition of Joyce Mealus, transcript forthcoming).

35.     Plaintiff's subsequent employment application to Kraft Foods states that her reason for leaving Nirvana was that she "got a better paying job." (Ex. 20, p6.) Kraft produced the document in response to a subpoena and Plaintiff's digital signature appears on the document. (*Id.*, p8.)

36.     At her deposition, Plaintiff denied that she had given her notice at Nirvana because she was leaving to join Barrett. (Ex. 2, p204, ln 17-19). In her unemployment application (her excuse for quitting being harassment), she also claimed to have lied about the Barrett situation, saying, "I had put in my notice telling them I had a new job even though I didnt have a job, I just had to get out of there." (Ex. 22, p3). She makes these claims in spite of her January 19 application to work at Barrett (Ex. 24, p2), her February 7 drug test at Barrett (*id.*, p3), her February 8 Facebook message saying she was going to work for Barrett (Ex. 17, p17), and the first line of Plaintiff's own email to Defendants on February 9, 2012 (Ex. 1, p2), all of which support Jeanie Hellinger's sworn testimony about the circumstances of Plaintiff's departure.

37.     While referring to Nirvana as a "shithole" in one of her several profanity-laced tirades on Facebook, Plaintiff made a comment on her former coworker Alyssa Johnson's page and called Defendants—who were born in the Middle East, assisted the United States government and fled to Upstate New York after the Iranian revolution, with one of them having been tortured in an Iranian prison—"towel heads." (Ex. 19.) Plaintiff was then evasive under oath about the existence of the post: "Q. Did you ever post anything on Alyssa Johnson's Facebook page about Nirvana? A. Not that I recall. Q. Or about the owners of Nirvana? A. Not that I recall. Q. Ever post anything on Facebook about Mansur? A. No." (Ex. 2, p40, ln 11-23). Alyssa Johnson then confirmed that Plaintiff made the post (Ex. 18., pp17-19), and produced a copy (Ex. 19).

38.     On March 21, 2012, Plaintiff sent her lawyers what she represented as being a copy of her February 9, 2012 email. (Ex. 2, p181, ln 20-24.) However, the March 21 email (Ex. 21) was a substantially edited version of the prior email. The first line of the February 9 email, stating that "Mansur let me go," was removed. The threats about sending pictures of dirty water samples were gone. (In addition, the word "REDACTED" is stamped on the email, with the TO: field blacked out. Plaintiff testified that she sent the email to her lawyer, Derek Smith. (Ex. 2, p182, ln 13-17.))

39.     Although Plaintiff admitted sending the email earlier in her deposition, (Ex. 2, p181, ln 20-24), later in her deposition she proceeded to deny sending it (Ex. 2, p184, ln 3-12.) Instead, she claimed that her sister sent the email. (Ex. 2, p184, ln 5.) She said her computer had a virus (*id.,* ln 1-2) and had died (*id.*, p186, ln 23). Under oath and subject to penalty of perjury, she swore that she had given her sister access to her own email account (*id.,* ln 9-11), and her sister sent the email to counsel using Plaintiff's email account (*id.*, p184, ln 6-12). Despite allegedly granting her sister access to Plaintiff's own email account, and despite the origin of the email being Plaintiff's own email account, Plaintiff nonetheless claimed that she forwarded the email to her sister's email account so her sister could see it. (*Id.,* p187, ln 3-12.) Her explanation for not sending the email to her lawyer herself was that she did not have her lawyer's email address at the library (*id.*, p190, ln 8-10)—despite having already sent emails to her attorney and received them from him, emails that even today remain in Plaintiff's Gmail account, and could have simply been replied to. (See, e.g., Ex. 27, p2.)

40.     Defendants demanded that Plaintiff produce all emails relevant to this case, and in our Motion to Compel, we specifically asked for the email Plaintiff forwarded to her sister, should any exist. (Ex. 26.) Plaintiff produced what she alleged were all emails relevant to this case. (See

Ex. 23.) Plaintiff's alleged forwarded email to her sister was not among them. It does not exist. Plaintiff does not allege that it was deleted or destroyed. There is no evidence that it ever existed.

41.     Plaintiff's sister testified in no uncertain terms that Plaintiff had never emailed her about this case, had never given her a password to her email account, and she had never edited an email on Plaintiff's behalf. (Ex. 14, p10 ln 19- p11 ln 25; p 17 ln 20- p18 ln 15). "She's never e-mailed me anything ever, whether it's this case or anything else, I don't get e-mails from her." (*Id.,* p11, ln 4-6.) Furthermore, both Plaintiff's sister and mother confirm that Plaintiff had access to an internet-connected working computer during all relevant times in this litigation (*id.,* p18 ln 16-17, p21 ln 22-24; deposition of Joyce Mealus, transcript forthcoming.)

42.     Plaintiff claimed to have lived alone at the time of her employment with Nirvana. (Ex. 25, p3.) Her mother and sister testified to the contrary, stating that Plaintiff lived with her parents for the last several years (Plaintiff's mother Joyce Mealus testified that Plaintiff lived with her for the last four or five years (deposition transcript forthcoming); Plaintiff's sister Julie Mealus Nellenback testified that Plaintiff had been living with her parents since 2006 (Ex. 14, p14, ln 18-20)).

                                            Respectfully submitted,

Dated: February 14, 2014                    *J. Pertz*

                                            JOSIAH PERTZ, ESQ.
                                            Attorney for Defendant Rafizadeh
                                            Bar Roll: 603028
                                            Pertz & Pertz, PLLC
                                            12280 Route 365
                                            Remsen, NY 13438
                                            315-732-4900
                                            Josiah.Pertz@gmail.com

TO:

JESSE C. ROSE
Attorney for Plaintiff Cherie Mealus
Phillips & Associates, Attorneys At Law, PLLC
45 Broadway, Suite 620
New York, NY, 10006
Tel: 212-248-7431

ROBERT F. JULIAN, ESQ.

Attorney for Nirvana Spring Water, Inc.
Bar Roll: 601157
2037 Genesee St.
Utica, NY 13501
315-797-5610
Robert@rfjulian.com