UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Cherie Mealus | **MEMORANDUM OF LAW** |
| Plaintiff | IN SUPPORT OF  DEFENDANT |
| | RAFIZADEH'S MOTION FOR |
| vs. | SUMMARY JUDGMENT |
| | |
| Nirvana Spring Water, Inc. | Civil Action No: |
| Mansur Rafizadeh | 7:13-CV-0313 ( M A D / D E P ) |
| Defendants | |

## Contents

**AUTHORITIES** ........................................................................................................ ii

**PRELIMINARY STATEMENT** ............................................................... 1

**I.    PRECEDENT PERMITS DISMISSAL OF PLAINTIFF'S SUIT EVEN IF FACTS ARE IN DISPUTE** ................................................................... 3

**II.    PLAINTIFF BRINGS THIS LAWSUIT IN BAD FAITH**............................................ 5

  **A. THE LAWSUIT IS PART AND PARCEL OF PLAINTIFF'S ILLEGAL ACTS.** ........ 5

  **B. PLAINTIFF RELIES EXCLUSIVELY ON HER OWN TESTIMONY**........................ 9

  **C. PLAINTIFF CONTRADICTS HERSELF** ................................................................ 10

   1.    **Plaintiff's Contemporaneous Statements Contradict Her Complaint as to the Nature of her Departure**........................................................................... 10

   2.    **Plaintiff's Private, Contemporaneous Facebook Posts Contradict Her Subsequent Complaint and Testimony** ......................................... 12

   3.    **Plaintiff's Testimony Contradicts Her Medical Records.**.................................... 13

   4.    **Plaintiff's Statements During Her Employment Contradict the Complaint She Filed after Leaving.**................................................................. 14

   5.    **Plaintiff's Contradictory Testimony about Emails Is Further Evidence of Her Untruthfulness.**............................................................................ 15

  **D.    THE UNDISPUTED FACTUAL RECORD PREVENTS ANY REASONABLE JURY FROM FINDING FOR PLAINTIFF** ........................................................ 15

**III.    PLAINTIFF HAS FAILED TO STATE FACTS SUFFICIENT TO SUPPORT ANY OF HER CAUSES OF ACTION** ............................................................... 18

  **A.    PLAINTIFF HAS NOT PLED FACTS SUFFICIENT SUPPORT A HOSTILE WORK ENVIRONMENT CLAIM UNDER NYSHRL**........................................ 18

**B.      PLAINTIFF HAS NOT ALLEGED FACTS SUFFICIENT FOR A CLAIM OF RETALIATION UNDER NYSHRL** ................................................................................... **20**

**C.      PLAINTIFF'S CAUSE OF ACTION FOR COMMON LAW ASSAULT IS BARRED BY THE STATUTE OF LIMITATIONS**.............................................. **20**

**D.      MANSUR RAFIZADEH IS NOT AN AIDER OR ABETTOR UNDER NYSHRL…** ...................................................................................................................... **20**

**CONCLUSION** ......................................................................................................... **21**

****

# AUTHORITIES

## Cases

*Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456,..................................................... 3
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986) ......................................... 3
*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, (2d Cir. 2001)....................... 3
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) .............. 3
*Dawes v. Coughlin,* 964 F.Supp. 652, 657 (N.D.N.Y.1997) ......................................... 4
*Denton v. Hernandez,* 504 U.S. 25, 32, 33 (1992)................................................... 4, 8, 9
*Folkes v. New York College of Osteopathic Med.,* 214 F.Supp 2d 273, 293 (E.D.N.Y. 2002) .... 19
*HealthCare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 363 (S.D.N.Y. 2007) ................................................................................................................... 19
*Jeffreys v. City of N.Y.,* 426 F.3d 549, 554-55 (2d Cir. 2005) ............................... 4, 8, 9
*Mathis v. Spears,* 857 F.2d 749, 752 (Fed.Cir. 1988) ................................................. 20
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).............................. 3
*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc*., 715 F.3d 102, 11 (2d Cir. 2013)................ 17
*Mohan v. Target,* 2009 U.S. Dist. LEXIS 82807 (W.D.N.Y. Sept. 8, 2009) .............................. 17
*Niles v. Nelson,* 72 F.Supp.2d 13 (N.D.N.Y.1999)....................................................... 19
*Pennsylvania State Police v. Suders,* 542 U.S. 129, 147 (2004) ................................. 19
*Petrosino v. Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004) ....................................... 19
*Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) ............................ 3
*Rodriguez v. Murphy,* No. 91 CV-0650E(F), 1994 WL 735859, at *4 (W.D.N.Y. Jan. 3, 1995).. 4
*Schmidt v. Tremmel,* No. 93 Civ. 8588 (JSM), 1995 WL 6250, at *3 (S.D.N.Y. Jan.6, 1995)...... 4
*Scholastic, Inc. v. Harris,* 259 F.3d 73, 87 (2d Cir.2001)............................................... 3
*Scott v. Harris,* 550 U.S. 372, 380 (2007) ............................................................... 3, 4
*Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998) ................................................... 3
*Shabazz v. Pico,* 994 F.Supp. 460, 470 (S.D.N.Y. 1998) ........................................... 4, 9
*Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) ............................................... 19

## Statutes

Fed.R.Civ.P. 56(c) ..................................................................................................... 2
N.Y. EXEC. § 296 et seq ......................................................................................... 2, 19

## PRELIMINARY STATEMENT

*"My lawyer is ready to proceed with a very public sexual harrassment suit against Mansur and Nirvana…. Also I have about a hundred or so pictures of dirty micro tests from the Lab. I have addresses of all the states you send water and will send the pictures to all the companies you bottle water for and all the state health departments. That could be very costly to your company. I will go public with this as well…. All I am asking is that you dont deny my unemployment and want a settlement in the amount of $5000, 1 thousand per year of service. I want that within one week from today or this all goes public. I will be sending the pictures as well so you know i am not lying about having them."* –Cherie Mealus, email to Defendants, February 9, 2012, 3:49am. (Ex. 1, p3.)[1]

     This lawsuit is not simply brought in bad faith; it is part and parcel of a crime. Threatening to publish pictures of laboratory tests doctored to suggest that Defendant was selling contaminated water, and threatening a "very, very public" sexual harassment lawsuit, Plaintiff Cherie Mealus sought to extort $5,000 from Mansur Rafizadeh and the water bottling company Nirvana. Since commencing this lawsuit, Plaintiff has made demonstrably false statements under oath. She has repeatedly contradicted herself. Her own sister and mother have refuted her testimony. And of the dozens of current and former employees who could have been present to witness the conduct she alleged, none have testified to having witnessed anyone sexually harass her.

     Discovery has made Plaintiff's fabrications clear enough that judgment should be taken against her as a matter of law. Her perjury about her sister editing her incriminating email before sending it to a lawyer, a story fabricated to protect Plaintiff from evidencing knowledge of her own guilt, is particularly exposed. Plaintiff's private post on Facebook that she vomited every day for six months because of her boyfriend (rather than because of Defendants' conduct, as she alleges in her complaint) is also egregious. At medical appointments during her employment,

---

[1] Note that the exhibit citations refer to the page number in the PDF, not to a page in the underlying document.

Plaintiff never complained of any emotional injury, and specifically denied nausea and vomiting. But a month after she left Nirvana, and after announcing her intention to sue and retaining counsel, she sought out a doctor and reported depression and anxiety, and claimed that her employment at Nirvana had caused her constant vomiting for six months. Far from supporting her claims, Plaintiff's coworkers report that she planned her extortion scheme against Defendants months in advance, doctoring water samples and taking pictures as an "insurance policy" in case her job were ever threatened.

Moreover, Plaintiff does not state facts sufficient to support any of her causes of action. Plaintiff alleges sexual harassment (hostile work environment; no quid pro quo is pled), retaliation and aiding/abetting under N.Y. EXEC. § 296 et seq. (the "NYSHRL"), along with common law assault and battery. Plaintiff's claims rely on supposed episodes that are not severe or pervasive enough to support a claim for either a hostile work environment or retaliation by constructive discharge, and her assault claim is time-barred. In any case, Plaintiff's allegations, which are based exclusively on her own testimony, are impossible for a reasonable jury to believe. This is a rare case in which Plaintiff's contradictions are so numerous and her fraud so patent that the Court should follow established precedent in such situations, dispense with her allegations and dismiss the complaint.

# ARGUMENT

## I.     PRECEDENT PERMITS DISMISSAL OF PLAINTIFF'S SUIT EVEN IF FACTS ARE IN DISPUTE

Summary judgment is appropriate upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). When the nonmoving party fails to make a showing on an essential element of its case with respect to which it bears the burden of proof, summary judgment will be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). When deciding a motion for summary judgment, the court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456, 466 (2d Cir. 2001). Summary judgment, even in a discrimination case, must be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). As the United States Supreme Court has held, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986); *see also Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004). The "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d

3

Cir. 1998). In order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor, "even where facts are disputed." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, (2d Cir. 2001).

Although a court generally must leave the assessment of a witness's credibility to the jury, *see, e.g., Scholastic, Inc. v. Harris,* 259 F.3d 73, 87 (2d Cir.2001), a court may properly dismiss a claim in "the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete." *Jeffreys v. City of N.Y.,* 426 F.3d 549, 554-55 (2d Cir. 2005) (affirming grant of summary judgment where the plaintiff relied exclusively on his own testimony, which was "replete with inconsistencies and improbabilities"). "[W]hen the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court is] authorized to pierce the veil of the complaint's factual allegations, dispose of some improbable allegations, and dismiss the claim." *Shabazz v. Pico,* 994 F.Supp. 460, 470 (S.D.N.Y. 1998) (Sotomayor, J.) (citing *Denton v. Hernandez,* 504 U.S. 25, 32, 33 (1992), and other cases[2]). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

---

[2] *See also Dawes v. Coughlin,* 964 F.Supp. 652, 657 (N.D.N.Y.1997) ("plaintiff's version of events is beyond belief"); *Schmidt v. Tremmel,* No. 93 Civ. 8588 (JSM), 1995 WL 6250, at *3 (S.D.N.Y. Jan.6, 1995) (citations omitted) ("No reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [the] complaint or in [the] subsequent missives to the court."); *Rodriguez v. Murphy,* No. 91 CV-0650E(F), 1994 WL 735859, at *4 (W.D.N.Y. Jan. 3, 1995) ("great weight is placed on the proposition that [the court] might properly dispose of improbable allegations on a summary judgment motion").

For the reasons stated below, this case falls within the narrow category of cases where Plaintiff's story is so contradictory, unsupported and patently fraudulent that judgment should be taken against her as a matter of law.

## II.   PLAINTIFF BRINGS THIS LAWSUIT IN BAD FAITH

### A.   THE LAWSUIT IS PART AND PARCEL OF PLAINTIFF'S ILLEGAL ACTS

Plaintiff's complaint and the allegations therein are in furtherance of an illegal, fraudulent scheme to extort money from Mansur and Mozafar Rafizadeh. An evaluation of the totality of the circumstances in this case must include the undisputed evidence of Plaintiff's extortionate posture in initiating and continuing this lawsuit.

Plaintiff's February 9, 2012 email speaks for itself. (Ex. 1.)  There is no light in which the way in which Plaintiff announced this lawsuit can be seen as anything but extortionate. It is not a good faith settlement offer—Plaintiff's admitted lie about having a lawyer, and lie about following a lawyer's instructions to inform that she planned to smear them and their business if she was not paid off, immediately belie that notion. (Ex. 2, p164 ln 24-p165 ln 6.)

But the truly vicious nature of Ms. Mealus's conduct is clearest in the wake of her threats involving contaminated water samples. If there were any truth in her claims that she knew Nirvana water was toxic and going out to customers (Ex. 2, p171, ln 9-17), why has she not in fact disclosed her evidence to public health authorities, to the media, to her Facebook friends in 49 states? Even after she left her employment? (*Id.,* p172). Has she no concern for the thousands who could sicken or even die drinking water she swore under oath was tainted? But in the two years since the threatening e-mail, she made no further mention of the supposedly poisonous water, for the simple reason that the claims and the pictures are no longer useful tools for

extortion. Now, Plaintiff only pursues the fraudulent story of sexual harassment, since Ms. Mealus believes it could result in money for her, while complaining about doctored water samples could not. Of course there is nothing to protect the public against, since there is no truth in the claims about the water (see also Ex. 3, p6, para. 38), so there was nothing for her to "go public" about, and no motive to do so after the threat failed. Even assuming her contaminated water claims were not false and fraudulent, in the February 9, 2012 e-mail, she shows no hesitation about offering to trade public health and safety, and perhaps someone's life, for $5,000 and unemployment benefits.

Plaintiff then lied to cover her tracks. Plaintiff sent an email to her counsel on March 21, 2012 (Ex. 21) with the incriminating evidence of her extortion attempt regarding the dirty water edited out. It was proof of a guilty conscience, and recognition that, should her lawyers see this, they would be unlikely to take her seriously or pursue the case. Then, in order to distance herself from the edits, she concocted a convoluted story. Under oath, she swore that she forwarded the email to her sister's email account, who nonetheless logged in to Plaintiff's account in order to edit and send the email to her lawyer, all because Plaintiff had to go to the library because her own computer had a virus, and because she did not have her attorney's e-mail address at the library. (See Ex. 2, 181-90.) Mealus' e-mail account was on Gmail. It is universally known that a search on Gmail—such as the basic search Plaintiff conducted in order to produce this very email in this lawsuit—would unearth the attorney's e-mail address.

In telling the story, Plaintiff demonstrably made false statements under oath. Plaintiff produced what she alleged were all emails relevant to this case. (See Ex. 23; our earlier specific production request is Exhibit 26.) Plaintiff's alleged forwarded email to her sister was not among them. It does not exist. Plaintiff does not allege that it was deleted or destroyed. There is no

evidence that it ever existed. The entire story is an obvious fabrication to cover a guilty awareness that the February 9th e-mail was an extortion attempt.

The inference that Plaintiff edited the email herself to avoid having her lawyers know that she attempted extortion, then perjured herself by inventing a story about her sister doing the editing, is further supported by the testimony of two of Plaintiff's family members. Plaintiff's sister testified in no uncertain terms that Plaintiff had never emailed her about this case, had never given her a password to her email account, and she had never edited an email on Plaintiff's behalf. (Ex. 14, p10 ln 19- p11 ln 25; p 17 ln 20- p18 ln 15). "She's never e-mailed me anything ever, whether it's this case or anything else, I don't get e-mails from her." (*Id.,* p11, ln 4-6.) Furthermore, both Plaintiff's sister and mother confirm that Plaintiff had access to an internet-connected, working computer during all relevant times in this litigation (*id.,* p18 ln 16-17, p21 ln 22-24; deposition of Joyce Mealus, transcript forthcoming.)

The criminal nature of Plaintiff's actions is sealed by the fact that key elements of this scheme were premeditated. Plaintiff devised the "dirty water" part of this scheme months in advance, in case she should ever find herself without work. Several of her coworkers witnessed her preparing the scheme, which culminated in her extortionate email of February 9, 2012. Plaintiff's supervisor George Zehr swore to the following: "She did make a comment to me while she was working at Nirvana that she was taking pictures. She did not say what of. It was in the context of conversation in which she was putting the place down. I asked her of what she was taking pictures. She did not answer." (Ex. 3, aff. of George Zehr, p. 16, para. 8).  Plaintiff's coworker Francis Rocker: "On several occasions she came from the lab, back to the pallet area, and pulled out petri dishes, loaded with mold and spots. She said they looked like that because she had left them in the incubator for a week (the correct time being 48 hours (Ex. 2, p107, ln 2-

7)), and said, in substance 'you know what I could do with these? I could shut this whole place down. All I have to do is make one phone call to the state or the health department.' She told me she was taking pictures of these things in case anything ever happened to her; if she lost her job here, or got messed up in anyway." (Ex. 3., aff. of Francis Wilbert Rocker III, p11, para. 23). Plaintiff's supervisor Leo Hellinger: "She said, in substance. If anything happened, if I got fired or if I needed a job later, this would be an insurance policy to get back in. She said I have a relative to whom I could show this and have this place shut down." (Ex. 3, aff. of Leo Hellinger, p21, para. 19).

Plaintiff tried to capitalize on this "insurance policy" immediately: she used her phone to email herself the photos of the dirty water samples the day she left Nirvana, within hours of leaving if not sooner (see, e.g., Ex. 4, p5), then composed her extortionate email over the course of several hours, and hit send. (Ex. 2, p161, ln 3-5.)

The Court must note that the cleanliness of Nirvana's water is not a fact that is genuinely in dispute. The water is tested constantly, at multiple points in the bottling process, with samples maintained for years in case a problem is ever reported. Independent testing is carried out by government authorities. Never has a shipped product been anything but absolutely safe for human consumption. (Ex. 3, p6, para. 38.) The quality of the water is of the highest importance to the business. Especially considering the speed information travels in the digital age—"I will go public with this as well, take the pictures to television stations, newspapers, post all the pics on facebook and myspace and have all my friends repost"—any defamatory rumor about contamination could be devastating—"very costly to your company." (Ex. 1, p3.) Plaintiff knew just where to hit them.

The Court is not obligated to take the sexual harassment allegations she mentions in the same breath with any more seriousness. Ms. Mealus's obvious malice and lack of credibility is so great that no reasonable jury could ever believe her. With so much doubt cast upon her testimony, the court is "authorized to pierce the veil of the complaint's factual allegations, dispose of some improbable allegations, and dismiss the claim." *Denton,* 504 U.S. at 32.

## B.      PLAINTIFF RELIES EXCLUSIVELY ON HER OWN TESTIMONY

Summary judgment can be appropriate in "the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete." *Jeffreys*, 426 F.3d at 554-55. This is the case here. Of the hundreds of potential employees who could have seen any of the potentially actionable behavior Plaintiff alleges over several years, none have testified to witnessing any sexual harassment whatsoever. Though she claims to have informed her supervisors of two instances of Mansur's conduct, Plaintiff's supervisors testify that Plaintiff had not made any claims of sexual harassment prior to this lawsuit. (Ex. 3, affidavits of Jeanie Hellinger, George Zehr and Leo Hellinger.)

Plaintiff proffered her close friend Heather Gorczyca as a witness to the alleged conduct of Defendant. However, the complete extent of what Ms. Gorczyca witnessed is the following: "I was sitting on the floor painting the grates, and Mansur would always - you know - take a tour of the plant with whoever was in the lab. Well, that was just something he does. And Cherie would walk a little bit ahead, and he was just trying to rub her arm, grabbing her elbow or her shoulder, stuff like that." (Ex. 10, p62, ln 18-24). "Q. Did you observe her try to scooch away from him a little or -- A. No, not that I recall." (Ex. 10, p64, ln 22-24). "Q. Was that -- that was the only time

you were -- A. That I've actually witnesses anything. Q. That you actually witnessed anything? A. Yes." (Ex. 10, p63, ln 11-14). This testimony is not evidence of actionable conduct.

Plaintiff also offered hearsay evidence that a woman named Kelly Flynn who was "employed there at Nirvana" told her that "Mansur rubbed up against her and she told him not to." (Ex. 2, Plaintiff's dep., p13 ln 20-p14 ln 2.) At her own deposition, Kelly Flynn roundly rejected this, revealing that she had never worked for Nirvana, had only been to Nirvana once, had only been on the premises for a matter of minutes, never had any interaction whatsoever with either Mansur or Mozafar or came anywhere near them, and never witnessed anything remotely resembling sexual harassment in the five total minutes she had been there. (Ex. 16, p9). Flynn's testimony is evidence of nothing apart from Plaintiff's willful deception.

## C.     PLAINTIFF CONTRADICTS HERSELF

Courts have dismissed claims when the only leg they have to stand on is Plaintiff's own ipse dixit, and where the record is mired in contradiction and improbability. See *Harris,* 550 U.S. at 380; *Jeffreys,* 426 F.3d at 554-55; *Shabazz,* 994 F.Supp. at 470; *Denton,* 504 U.S. at 32, 33. Here, Plaintiff's contradictions follow from her sworn testimony and documents whose veracity she has admitted.

## 1.     Plaintiff's Contemporaneous Statements Contradict Her Complaint as to the Nature of her Departure

The fraudulent and bad faith nature of this action can quickly be gleaned by comparing paragraph 51 of the complaint (Ex. 7, p10), wherein Plaintiff claims she "quit" because of her nauseated emotional reaction to Mansur, while in the very first line of her February 9, 2012 e-mail (Ex. 1, p2) she complains that Mansur "let her go" in favor of someone else.

Other private, contemporaneous statements by Plaintiff paint a very different picture of how she came to depart from Nirvana than she alleges in her complaint. In the early morning of February 8, 2012, before she received word from Barrett Paving that she would not be hired and less than 24 hours before sending her extortionate email to the Rafizadehs, she communicated with a new hire at Nirvana privately by Facebook message: "There is a whole lot to learn and some stuff Meagan dont even know yet since she is so new. yes she is a very nice girl and I like her alot. I am going to see if I can work a couple nights with you next week and teach you a few 'tricks' that make the job easier." (Ex. 17, p17). Of Mansur she said merely, "Mansur is VERY interesting to say the least. He has some very interesting stories to tell once you get to know him better." (*Id*.) While not glowing, her total analysis of the job was hardly one of repulsion, and contained no mention of sexual harassment: "I think you will like it there, I loved the job itself but some of the other bullshit I didnt care for but there is good and bad with every job i guess." (*Id*.)  She concluded with an admission that she had already planned to start her new job, but sought to return to Nirvana anyway to train the new hire: "Also I will be done at Barrett at 3:30 in the afternoon, I might see if they want me to come up a couple days and work with you for a few hours to make sure you are totally comfortable with it. the one problem they have is they rush people's training and I dont want to see that happen to you. Time for work :-)" *(Id.)* She had no problem speaking to Mansur about the request to keep working even after she had already decided to leave for a job at Barrett: "Maybe I will see you a couple days next week...going to talk to mansur about that today." (*Id.*)

It is not the message someone would send if she knew she were not getting the job at Barrett, contrary to her deposition testimony: "Q. When in relation to when you left Nirvana did you learn you weren't going to get the Barrett job? A. A couple of days." (Ex. 2, p155, ln 10-12.)

More importantly, this is not the private message someone would send to a new female hire if she had quit due to a work environment and an employer she subjectively believed to be hostile.

Plaintiff tells yet another version of the story in an email to her attorney, which she included as part of her application for unemployment. She claims to have lied to Nirvana about having a job before leaving employment: "I had put in my notice telling them I had a new job even though I didnt have a job, I just had to get out of there." (Ex. 22, p3). At her deposition, she testified that she had in fact been offered new employment with Barrett: "Q. Okay. And when did you go for the interview at Barrett? A. I don't know the date. Q. Was it near the time that you quit or far from the time that you quit? A. A couple of weeks, three weeks possibly. Q. All right. And what did Barrett tell you when you had your interview? A. That I got the job." (Ex. 2, p152, ln 8-16.)

Then, in her application for employment at Kraft Foods, submitted on October 11,2012, Plaintiff was asked to write in the reason she left her employment at Nirvana. She wrote the following: "got a better paying job." (Ex. 20, p6.)

**2.      Plaintiff's Private, Contemporaneous Facebook Posts Contradict Her Subsequent Complaint and Testimony**

Plaintiff's complaint, paragraphs 40 and 43, stated the following: "Defendant RAFIZADEH's consistent unwanted sexual advances became so frequent and offensive that they were making Plaintiff MEALUS physically ill on a daily basis." She alleged that Defendants' conduct was the cause of her alleged illness. "Q. Okay. Apart from issues at Nirvana, were other things going on at that time that had an impact on your emotional condition? A. No. Nope." (Ex. 2, p65, ln 8-11.)

In comparison, Plaintiff wrote the following on Facebook on February 15, one week after ending work at Nirvana: "This might be TMI but I must share...I went out with a guy for almost 6 months and for over 4 of those his months his ex caused utter chaos in our lives and he let it happen and I was so upset that I got sick every day for 4 months...well I ended it a little over a week ago and today for the first day in 4 months I did not throw up!!! YAY ME!!!!!" (Ex. 17, p13).

She restricted access to the comment so it was hidden from public view. There is only one mention of sexual harassment in Plaintiff's Facebook status updates during the time of her employment, and it was a dirty joke made by Plaintiff herself: "is wondering if it is classed as sexual harassment if a midget walks by you and tells you your hair smells nice". (Ex. 17, p7). This is not the post of someone who is sickened by pervasive sexual harassment.

In general, her private Facebook messages with coworkers about her job are mundane and contain no impression that she is experiencing a hostile work environment. (Ex. 17.) The worst she says about Nirvana's chairman is that "mansur has been grumpy." (*Id.*, p20.)

### 3.    Plaintiff's Testimony Contradicts Her Medical Records.

Plaintiff's complaint paints her emotional suffering at Nirvana as unbearable—yet Plaintiff never complained of emotional symptoms at each of her many medical visits during her employment. (Ex. 12.) Plaintiff only began to complain of depression and anxiety due to sexual harassment after initiating this lawsuit, and a month after she left Nirvana (*id.*, p15).

On March 7, 2012, Plaintiff told her doctor she vomited every day for six months, after most meals and sometimes in between. (*Id.*, p15). At her visit on November 29, 2011, three months and eight days earlier—and before she left Nirvana and decided to bring a lawsuit—Plaintiff specifically denied these same symptoms. (*Id.*, p11). Her explanation for this

discrepancy is factually inaccurate: "Q. Okay. But my question was: You said that this daily nausea vomiting was going on for something like six, eight months prior to February 8th, 2012, correct? A. Yes. Q. My question is: Prior to February 8th of 2012, did you make complaints to Dr. Ahmad about that condition? A. No. Q. Why not? A. I didn't see him." (Ex. 2, p63, ln 9-18). "Q. Okay. Because had this been going on and you saw Dr. Ahmad, you'd tell him, correct? A. Yes." (*id.*, p64, ln 14-16). In fact, according to her medical records, Plaintiff saw Dr. Ahmad several times during her employment with Nirvana, including the visit in November of 2011 (Ex. 12, p11). She never complained of symptoms of emotional upset and specifically denied the gastro-intestinal symptoms she later alleged. (*Id.*)

At her deposition, Plaintiff attributed her stress and weight change not to her employment but to this lawsuit: "Q. Sure. Firstly, during the period that you worked at Nirvana, did your weight change substantially from the beginning to the end? A. No, I don't believe so. Q. All right. So if there was some weight change, is that a weight change that occurred after you left? A. Yes. Q. And do you attribute that somehow to what was done to you at Nirvana? A. I attribute it to a lot of stress. Q. And what's causing you stress now? A. This whole thing. Q. This lawsuit? A. Yes." (Ex. 2, p230, ln 9-22.)

## 4. Plaintiff's Statements During Her Employment Contradict the Complaint She Filed after Leaving

Plaintiff's repeatedly expressed positive feelings about Nirvana, up until she threatened a lawsuit. (Ex. 5.) Far from expressing concerns about sexual harassment to her supervisors, she wrote, "I, unlike most people here, like my job here" (*Id.,* p5), and "I really like working here and love the job that I do but $10.50 is just simply not enough to live on when trying to raise a teenager." (*Id.*, p2.) She even recommended the job to her best friend, Heather, who wrote about

14

Nirvana on her employment application, "I've heard very good things about the company" ("Cherie was getting me a job"). (Ex. 10, p24, ln 5-13.)

**5.     Plaintiff's Contradictory Testimony about Emails Is Further Evidence of Her Untruthfulness**

At her deposition, Plaintiff denied the existence of emails she later admitted. She was first asked, "Q. Have you e-mailed anyone any comments, remarks, descriptions of what you say occurred at Nirvana?" to which she replied, "A. No." (Ex. 2, p41, ln 23-25). The February 9, 2012 email she admitted pursuant to Defendants' Notice to Admit (Ex. 8, p6; Ex. 9, p2) clearly shows otherwise. Later, she was asked, "Q. Have you sent any e-mails that in any way referenced Nirvana?" "A. To Mansur." "Q. Okay. To Mozafar?" "A. No." (p42, ln 9-13). Exhibit 1 was addressed to both Mozafar and Mansur.

**D.     THE UNDISPUTED FACTUAL RECORD PREVENTS ANY REASONABLE JURY FROM FINDING FOR PLAINTIFF**

Plaintiff's claim is fundamentally implausible. A reasonable jury could not possibly believe that Cherie Mealus could have been repeatedly sexually harassed in light of the following:

-In a busy industrial setting, with dozens of people present in the plant at all times, no one witnessed any sexual harassment against her.

-Plaintiff made no written complaint during her employment, and no witness states they heard her make an oral complaint. Plaintiff's supervisors deny she made any complaint. (Ex. 3.)

15

-Plaintiff mentioned no emotional symptoms at her frequent doctor visits until after she left her employment and declared her intention to bring this lawsuit. (Ex. 12.)

-Plaintiff sent multiple emails during her employment saying how much she loved her job. (Ex. 5.)

-Plaintiff applied for a job with another company (Ex. 2, p152, ln 8-16), went for a drug test with that company (Ex. 24, p3), wrote on Facebook that she was going to that company and would be happy to return to Nirvana to train her replacement (Ex. 17, p17)—and then testified that she lied about having received another job offer (Ex. 2, p219 ln 24-p220 ln 3).

-Plaintiff sent an email threatening extortion and a lawsuit in the same breath. The email contains a variety of threats to publish false, malicious and highly detrimental allegations about the Defendants unless the Defendants immediately agreed to pay the Plaintiff the sum of $5,000.00. (Ex. 1.)

-Plaintiff contradicted her version of how she came to leave the company in the first line of the same email. Plaintiff emailed Defendants immediately after leaving Nirvana, saying "Mansur let me go today after almost 5 years of dedicated service. He kept a girl that has been there 1 day instead"—and then testified that she quit after being yelled at about leaving a book on a counter. (Ex. 7, p10, para. 51.)

-Plaintiff claimed to have a lawyer at the time, who she wrote told her to threaten extortion, and was prepared to sue. (Ex. 1.) Plaintiff had no lawyer. (Ex. 2, p164 ln 24-p165 ln 6.)

-Plaintiff sent an email on March 21, 2012 that edited out the incriminating evidence of her extortion attempt. (Ex. 21.)

16

-At her deposition, Plaintiff concocted a story about her sister cleansing the email of criminal content, which her sister flatly denied. (Ex. 14, p10 ln 19- p11 ln 25; p 17 ln 20- p18 ln 15.) Plaintiff claimed to have forwarded the email to her sister, but has not produced the email, because it does not exist. (See Ex. 2, p181-90, specifically p186, ln 12-21.)

-Plaintiff testified that she sent the email to her sister because her computer had a virus (See Ex. 2, p181-90), but both her sister and her mother confirmed that she had access to a working, internet-ready computer at home at all times during her employment with Nirvana and this litigation. (Ex. 14, p18 ln 16-17, p21 ln 22-24; deposition of Joyce Mealus, transcript forthcoming.)

-Plaintiff alleged to have taken Lexapro to deal with her emotional conditions while at Nirvana, even though she had no prescription. (Ex. 2., p54). She testified that she illegally obtained Lexapro from her mother, as her mother had a prescription for it and health insurance, which Plaintiff did not (*id.*, pp58-59). Plaintiff claimed to have given her mother money for the Lexapro (*id.*). Plaintiff's mother contradicted this story, testifying that she had never given Lexapro to Plaintiff, never shared her prescription with her, never took money from her for Lexapro. (February 4, 2014 deposition of Joyce Mealus, transcript forthcoming).

-Plaintiff contradicted her assertion that Defendants were the cause of her vomiting in a Facebook post she intended to be private. Blaming her vomiting on a boyfriend in a contemporaneous Facebook post, Plaintiff then alleged under oath that no other situation was causing her emotional strain at the time. Plaintiff later ransacked her ex-boyfriend's house, leading to a criminal conviction. (Ex. 2, p12, ln 14-25; Ex. 6, p2)

17

-Plaintiff wrote in a subsequent employment application that she left Nirvana because the pay was higher elsewhere. (Ex. 20, p6.)

-Plaintiff posted a racial slur against Defendants, calling them "towel heads" in a profanity-laced post on Facebook (Ex. 19), then refused to admit making the post during her deposition. (Ex. 2, p277).

Plaintiff's case relies entirely on her own testimony. The accrual of falsehoods, improbabilities and extortion tactics takes that testimony out of the realm of the reasonable. Generally, courts do not weigh in on a party's credibility at the summary judgment stage. But it is within this Court's inherent power to prevent abuse of the legal system for illicit purposes. This claim is harassing and false, and in the interest of justice it should now be dismissed, to prevent the expense of a trial that can only reasonably end one way.

## III.   PLAINTIFF HAS FAILED TO STATE FACTS SUFFICIENT TO SUPPORT ANY OF HER CAUSES OF ACTION

When asked at her deposition, Plaintiff confirmed that she does not allege other specific conduct by Defendants other than that which appears in her complaint and EEOC charge (Plaintiff's dep., p116 ln 8-19; p117, ln 14-22; p117 ln 22- p118 ln 1). When separated out from the enhancing language of the complaint, the conduct itself is insufficient to be actionable under the NYSHRL.

## A.   PLAINTIFF HAS NOT PLED FACTS SUFFICIENT SUPPORT A HOSTILE WORK ENVIRONMENT CLAIM UNDER NYSHRL

It should be a critical part of the inquiry whether Defendant "said or did anything that indicated he had sexual intentions or feelings toward [Plaintiff]." *Mohan v. Target*, 2009 U.S.

18

Dist. LEXIS 82807 (W.D.N.Y. Sept. 8, 2009). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc*., 715 F.3d 102, 11 (2d Cir. 2013) (citation omitted).

The vast majority of the conduct alleged by Plaintiff involves Defendant engaging in behavior that can be described as overbearing and obnoxious, but in no way sexual. For instance, requesting that Plaintiff pick up an item on the floor, handing Plaintiff trash to throw away even if he was standing next to a trash can, yelling at Plaintiff for work defects, calling Plaintiff stupid, bum and lazy, and handing an employee $20 (Ex. 7, p7, para. 29; p9, para. 46; p8, para. 33; p8 para. 34) are facially neutral. The burden is on the Plaintiff to provide some basis for inferring that the conduct is related to Plaintiff's gender, but Plaintiff provides none. The non-specific statement that Defendant "would repeat this conduct toward other women, but hardly ever, if ever, toward other male employees" (Ex. 7, p10, para. 47) does not identify what conduct it refers to, does not provide names, dates, or details of any incidents, does not state what conduct male employees were subjected to. It simply concludes what it seeks to prove. In an attempt to link allegedly obnoxious behavior with a gender-based motive, Plaintiff's complaint simply laces itself with conclusory language such as "inappropriate sexual advance or offensive tirade" (Ex. 7, p8, para. 34) and ascribes a sexual motive to every action of Defendant but provides little factual support for or testimony to justify those assertions.

Further analysis as to the insufficiency of the hostile work environment claim, along with extensive case law where even more severe and pervasive behavior did not rise to a violation of the NYSHRL, is provided in Defendant Nirvana's Memorandum of Law.

**B.      PLAINTIFF HAS NOT ALLEGED FACTS SUFFICIENT FOR A CLAIM OF
         RETALIATION UNDER NYSHRL**

Plaintiff has not alleged that any specific alleged wrongful acts were retaliatory, and

pleads no adverse employment action apart from constructive discharge. (Ex. 7, p10, para. 53.)

Mansur Rafizadeh's alleged actions did not rise to the high standard for a constructive discharge

as outlined in *Pennsylvania State Police v. Suders,* 542 U.S. 129, 147 (2004) and *Petrosino v.

Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004), among others. For full discussion, see Defendant

Nirvana's submissions. (The analytic framework governing retaliation claims pursuant to the

NYSHRL is identical to that under Title VII. *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir.

2010)).

**C.      PLAINTIFF'S CAUSE OF ACTION FOR COMMON LAW ASSAULT IS
         BARRED BY THE STATUTE OF LIMITATIONS**

The statute of limitations on an intentional tort in New York State is one year. N.Y.

C.P.L.R. § 215(3); s*ee also Folkes v. New York College of Osteopathic Med.,* 214 F.Supp 2d

273, 293 (E.D.N.Y. 2002). Plaintiff left Nirvana in February of 2012, and brought this action on

March 19, 2013, more than a year later. None of the conduct alleged falls within the one-year

statute of limitations. Thus, Plaintiff's Sixth Cause of Action must be stricken. (Plaintiff does not

expressly state an intentional infliction of emotional distress claim, but such a claim would be

time-barred as well, see *Niles v. Nelson,* 72 F.Supp.2d 13 (N.D.N.Y.1999)).

**D.      MANSUR RAFIZADEH IS NOT AN AIDER OR ABETTOR UNDER NYSHRL**

Mansur is not an "aider or abettor" under NYSHRL §296(6), as there has been no

actionable discrimination, retaliation, or harassment. *HealthCare Exch., Inc. v. Global

Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 363 (S.D.N.Y. 2007) ("accessory liability may

only be found where a primary violation has been established") (citation omitted). With respect to any allegedly infringing acts at Nirvana to which Mansur was not a part, there is no evidence that Mansur was aware of them or was anyway involved. Because Plaintiff has not shown that any issues of material fact apply to any provisions of New York's Human Rights Law, section (6) has no relevance.

## CONCLUSION

This lawsuit is part of a serious, significant and vicious crime. Cherie Mealus threatens the survival of a significant local employer, whose payroll provides direct sustenance to more than one hundred families, and indirectly to many more. She seeks and threatens, in her letters and lawsuit, to destroy Nirvana and the Rafizadehs. She armed herself to commit this crime months in advance, planning a fraudulent basis for extortion.

A party cannot be rewarded for "attempt[ing] to employ the courts as handmaidens to its iniquity." *Mathis v. Spears,* 857 F.2d 749, 752 (Fed.Cir. 1988). Title VII and the NYSHRL were designed to protect those legitimately injured by conduct that definitively altered the very nature of their employment. They were not designed to enable the fabrication of harassing lawsuits for the purpose of extorting money. Plaintiff has jumped the line ahead of all those waiting for and genuinely entitled to justice. Not only that, as her victims, she has chosen two elderly immigrants from an oppressive regime—whom she calls "towel heads"—who not only have done nothing wrong, but understand very poignantly and personally the blessing of civil rights that America grants. No reasonable jury could be fully presented with the facts of this case and find that the conduct Cherie Mealus alleged was severe or pervasive enough to be unlawful. Indeed, in the face of Plaintiff's demonstrable lies and contradictions, no reasonable jury could believe that it happened at all. Plaintiff has already perjured herself, slandered two innocent men, and wasted a

21

significant amount of this Court's time. She should not be allowed to abuse legal process any further.

Respectfully submitted,

Dated: February 15, 2014

*J. Pertz*

JOSIAH PERTZ, ESQ.
Attorney for Defendant Rafizadeh
Bar Roll: 603028
Pertz & Pertz, PLLC
12280 Route 365
Remsen, NY 13438
315-732-4900
Josiah.Pertz@gmail.com

TO:

JESSE C. ROSE
Attorney for Plaintiff Cherie Mealus
Phillips & Associates, Attorneys At Law, PLLC
45 Broadway, Suite 620
New York, NY, 10006
Tel: 212-248-7431


ROBERT F. JULIAN, ESQ.
Attorney for Nirvana Spring Water, Inc.
Bar Roll: 601157
2037 Genesee St.
Utica, NY 13501
315-797-5610
Robert@rfjulian.com

22