**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHERIE MEALUS,**

                                    **Plaintiff,**

          **vs.**                                    **7:13-cv-00313**
                                                    **(MAD/DEP)**

**NIRVANA SPRING WATER N.Y. INC.; and**
**MANSUR RAFIZADEH, individually,**

                                    **Defendants.**
_____

**APPEARANCES:**                    **OF COUNSEL:**

**PHILLIPS & ASSOCIATES,**          **JESSE C. ROSE, ESQ.**
**ATTORNEYS AT LAW, PLLC**          **EDWARD J. KENNEDY, ESQ.**
45 Broadway, Suite 620
New York, New York 10006
Attorneys for Plaintiff

**OFFICE OF ROBERT F. JULIAN, P.C.**    **ROBERT F. JULIAN, ESQ.**
2037 Genesee Street
Utica, New York 13501
Attorneys for Defendant
Nirvana Spring Water N.Y. Inc.

**PERTZ & PERTZ, PLLC**             **RICHARD PERTZ, ESQ.**
12280 Rt. 365
Remsen, New York 13438
Attorneys for Defendant
Mansur Rafizadeh

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

          On March 19, 2013, Plaintiff commenced this action pursuant to Title VII of the Civil

Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL"). *See*

Dkt. No. 1. Plaintiff's complaint contains the following causes of action: (1) Title VII hostile

work environment; (2) Title VII retaliation; (3) NYSHRL discrimination; (4) NYSHRL

retaliation; and (5) common law assault. *See generally id.*

Currently before the Court are Defendants' motions for summary judgment. *See* Dkt. Nos.

38 & 39.


## II. BACKGROUND[1]

Defendant Nirvana Spring Water N.Y. Inc. ("Nirvana") is a drinking water bottling

company with its principal place of business in Forestport, New York. *See* Dkt. No. 53 at ¶ 1. It

employs roughly 130 people. *See id.* Mozafar Rafizadeh, age sixty-one, is the company's CEO

and is in charge of the operations of the company. *See id.* Defendant Mansur Rafizadeh, his

eighty-three-year-old brother, serves as the chairman of the board of directors. *See id.* Both men

are immigrants to this country, having permanently left their native Iran following the revolution

of 1979. *See id.* Plaintiff Cherie Mealus was an employee at Nirvana from June 2004 through

March 2005. *See id.* at ¶ 2. She was rehired in March of 2008, laid off in the winter of 2009 and

rehired in March of 2009. *See id.* With various interruptions, Plaintiff worked at Nirvana from

then until February 8, 2012, for the most part assisting in laboratory testing of the water to ensure

its quality. *See id.*

Plaintiff sent several emails to Defendant Mansur Rafizadeh and other Nirvana employees

during her employment. In an email dated October 28, 2011, Plaintiff asked Defendant Mansur

Rafizadeh for a raise and indicated that, although she "like[s] working here and love[s] the job[,]"

she would be forced to look for other employment if she is not given a raise. *See* Dkt. No. 38-6

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on
the docket, it will cite to the page number assigned by the Court's electronic filing system.

at 2.  In another email dated January 5, 2012, Plaintiff expressed her belief that she deserved to be placed on the day shift and stated that she, "unlike most people here, like my job here." *Id.* at 5.

On January 19, 2012, Barrett Paving Materials, Inc. received an application for employment from Plaintiff.  *See* Dkt. No. 53 at ¶ 5.  On February 3, 2012, Plaintiff advised her supervisor that she had obtained employment at Barrett Paving and would be leaving her job at Nirvana as of February 17, 2012.  *See id.*  The job at Barrett Paving would carry better pay and a benefits package.  *See id.*  On February 6, 2012, Plaintiff advised her supervisor Jeanie Hellinger that she had to go for drug testing for her job at Barrett Paving the next day, February 7, and would have to leave work early for the test.  *See id.*  Plaintiff left work on February 7 at approximately 12:30 p.m. and Barrett Paving documented that she took a drug test that day.  *See id.*

Plaintiff sent a Facebook message to Tiffany Hylla, the person who was hired by Nirvana to replace her early in the morning of February 8, 2012.  *See* Dkt. No. 38-19 at 17.  In that message, Plaintiff offered to come in for a few hours during the week to assist in training Ms. Hylla.  *See id.*  In response to a comment by Ms. Hylla that "Mansur seems to be an Interesting Character," Plaintiff responded as follows:

> Mansur is VERY interesting to say the least.  He has some very interesting stories to tell once you get to know him better.  I think you will like it there, I loved the job itself but some of the other bullshit I didnt care for but there is good and bad with every job I guess. . . .  Also I will be done at Barrett at 3:30 in the afternoon, I might see if they want me to come up a couple days and work with you for a few hours to make sure you are totally comfortable with it. [T]he one problem they have is they rush people's training and I don't want to see that happen to you.

*Id.*

On February 8, 2012, in the early afternoon, Plaintiff received a telephone call from

Barrett Paving, informing her that they would not be hiring her after all. *See id.* at ¶ 7. Plaintiff would later explain the withdrawal of the employment offer in a Facebook message to a former Barrett Paving employee with whom she had spoken after the interview: "You fuckin trouble making bitch. . . u told the other clerk how much I was gonna be making even tho I wasn't sure what the rate was for sure. . . now they aren't hiring me because of you . . . fuck you you dumb fuckin bitch . . . go to hell!!!!" *See id.* Plaintiff confirmed this description of events in a different Facebook exchange, in which she demonstrated substantial agitation: "oh she is a fuckin cunt . . . its because of her i dont have that job. she told the other girl how much i was going to be making and then it got back to the office and they said it was a breech of confidentiality . . . missy did it, not me . . . Fuck that bitch." *Id.*

Defendants contend that, according to a supervisor at Nirvana, Jeanie Hellinger, when Plaintiff heard that Barrett Paving would not be hiring her after all, Plaintiff went to Ms. Hellinger, distraught, and said that she did not know what she was going to do. *See* Dkt. No. 38 (Defendants' Statement of Material Facts) at ¶ 8. Ms. Hellinger told Plaintiff that the job had already been filled. *See id.* Defendants also assert that Ms. "Hellinger told Plaintiff that Plaintiff could call Mansur directly, but that the decision on her replacement had been made: Plaintiff had given her notice, Nirvana had accepted, and had started training someone else." *Id.* According to Ms. Hellinger, Plaintiff responded "I know, I know," then went next door to the office to call Mansur Rafizadeh. *See id.* at ¶ 9. Ms. Hellinger claims that Plaintiff returned after about five minutes "screaming, cursing, slamming the door, collecting her belongings." *See id.* Ms. Hellinger claims that Plaintiff stated "'I've been here and they're giving my job to another girl.'" *Id.*

In her deposition, Plaintiff stated that, after she was informed that her employment offer

from Barrett Paving had been revoked, she did not inquire about keeping her position at Nirvana. *See* Dkt. No. 38-3 at 155-56. Further, Plaintiff contends that, after she returned from lunch on February 8, 2012, Defendant Mansur Rafizadeh screamed at her regarding a book that she left on a counter. *See id.* at 148-50. Plaintiff claims that Mansur Rafizadeh called her a "bum" and "lazy," and claims that no one else was present during this interaction. *See id.* at 150. Thereafter, Plaintiff alleges that she went to the bathroom, vomited, and then was "forced to quit" her job with Nirvana. *See id.* at 150-51.

According to Defendants, that evening, Plaintiff exchanged Facebook messages with the person whom she blamed for the loss of her job opportunity with Barrett Paving, "and the topic of sexual harassment appeared for the first time in Plaintiff's private correspondence[.]" Dkt. No. 38 at ¶ 11; Dkt. No. 53 at ¶ 11. Later on in the evening of February 8, Plaintiff began composing an email to Defendants which took her "hours to write." Dkt. No. 38-3 at 161. Plaintiff began the email by recapping her impression of how she left her employment: "Mansur let me go today after almost 5 years of dedicated service. He kept a girl that has been there 1 day instead." Dkt. No. 38-2 at 2. Plaintiff then indicated that she had a "few issues that need[ed] to be addressed" and listed "a few examples of personal harassment and sexual harassment by Mansur." *Id.* The examples provided are as follows:

> -Mansur asked me if I like to "suck it"
>
> -Mansur rubbed my arm and shoulder and "accidently" rubbed the side of my breast. He says accident but I know it wasnt. He touched inappropriately many times
>
> -Mansur asked me to a meeting at the house . . . told me to go to his bedroom and while there he told me to lay on the bed so he could push on my stomach while I was breathing, he said he wanted to teach me how to breathe . . . who asks employees to lay on their bed!!!

> -Mansur insinuated that if I didnt quit smoking that I would be out of a job
>
> -Mansur looked me up and down in a very gross disgusting sexual way on many many occasions, making me feel very uncomfortable
>
> -Mansur called me stupid on several occasions, called me dumb and lazy as well
>
> -Mansur told me a very inappropriate joke about a guy putting a cigar up his ass and liking it, making me feel very uncomfortable
>
> -While riding in a vehicle with Mansur he all of a sudden reached over and touched my stomach, saying he wanted to see how deep I breathe, very inappropriate way to be with an employee[.]

Dkt. No. 38-2 at 2-3. After providing these examples, Plaintiff indicates in her email that she has "times, dates and instances all wrote down from the day it started" and that she has "2 other past employees that are all ready and willing to come forward as well." *Id.* at 3. Although Plaintiff indicates in the email that she has consulted with an attorney who is ready to proceed with a sexual harassment suit against Defendants, during her deposition Plaintiff admitted that she did not, in fact, have an attorney who was ready to proceed with her lawsuit. *See id.*; *see also* Dkt. No. 38-3 at 164-65.

Thereafter, Plaintiff indicates that she has

> about a hundred or so pictures of dirty micro tests from the Lab. I have addresses of all the states you send water and will send the pictures to all the companies you bottle water for and all the state health departments. That could be very costly to your company. I will go public as well, take the pictures to television stations, newspapers, post all the pics on facebook and myspace and have all my friends repost and I have friends in all states except Hawaii which that one done [sic] matter anyway. . . . I do not want to hear back from you and anything I do hear back from you can and will be used in my lawsuit if I proceed with it. My lawyer told me to inform you of that. All I am asking is that you don't deny my unemployment and want a settlement in the amount of $5000, 1 thousand per year of service. I want that within on[e] week from today or this all goes public. I will be sending the pictures as well

> so you know I am not lying about having them.  My lawyer is
> prepared to sue for way more than 5000 for the treatment I endured
> while employed at Nirvana for almost 5 years. . . .  I want
> unemployment, the small settlement and my last paycheck and then
> I will go away forever and you will never hear from me again,
> otherwise me and 2 others are prepared to go ahead with a very
> public sexual harassment lawsuit.

*Id.*  Although the email indicates that it was sent on "Thursday, February 09, 2012 3:49 AM,"

Plaintiff claims that the time is incorrect and that it was actually sent around 11:30 a.m. on

February 8.  *See* Dkt. No. 38-3 at 161.  The following morning, Plaintiff emailed dozens of

pictures of the dirty water samples to Defendants.  *See* Dkt. No. 53 at ¶ 15.

During Plaintiff's employment with Nirvana, several of her colleagues witnessed her

taking photographs of water samples from the lab that showed contamination.  *See id.* at ¶ 16

(citations omitted).  According to Plaintiff's supervisor Leo Hellinger, in substance, Plaintiff said

"[i]f anything happened, if I got fired or if I needed a job later, this would be an insurance policy

to get back in.  She said I have a relative to whom I could show this and have this place shut

down."  *Id.*  During her deposition, Plaintiff indicated that she took the pictures because she "just

wanted to have [them] handy" and because "[s]omeone has got to shut that place down."  Dkt.

No. 38-3 at 179.

Heather Gorczyca, a woman who Plaintiff described as her best friend, testified that she

witnessed an incident involving Plaintiff and Mansur.  *See* Dkt. No. 38-11 at 63.  Ms. Gorczyca

testified that, "'while working there one night while I was at Nirvana painting, I saw Mansur

trying to touch and rub Cherie's arm while they were walking in the plant.'"  *Id.* (quotation

omitted).  When asked what she recalled about the incident, Ms. Gorczyca testified as follows: "I

was sitting on the floor painting the grates, and Mansur would always – you know – take a tour

of the plant with whoever was in the lab.  Well, that was just something he does.  And Cherie

would walk a little bit ahead, and he was just trying to rub her arm, grabbing her elbow or her shoulder, stuff like that." *Id.* Ms. Gorczyca testified that she did not observe any reaction from Plaintiff and that she simply went back to work. *See id.* at 64. Ms. Gorczyca further testified that this incident was the only time that she witnessed behavior of this nature while at Nirvana and that she never observed any other employees behaving inappropriately towards women. *See id.* at 64, 69-70. Although Plaintiff alleges that she was given the nickname "boobs" by several Nirvana employees, Ms. Gorczyca testified that Plaintiff had never complained to her about it. *See id.* at 81.

Defendants contend that, aside from Ms. Gorczyca, "[n]o other witness has offered testimony about the conduct Plaintiff alleges of Mansur." Dkt. No. 38 at ¶ 26. Plaintiff objects to this statement and claims that she has "identified the following individuals as having information about sexual harassment by Defendants: Heather Gorczyca, Alyssa Johnson, Gail (last name unknown), Terry (last name unknown), Clara (last name unknown), DeeDee (last name unknown), Deb (last name unknown), Christy Wilcox, Penny Levensailor, Mary Burr, Kim Matusczak, and Bridgette Hunter." Dkt. No. 53 at ¶ 26 (citing Plaintiff's Exhibit 6, Plaintiff's Responses to Interrogatory No. 7).

Plaintiff has identified a nurse, Mary Skiff, as a witness to her having sought treatment for emotional injury. *See id.* at ¶ 27. Ms. Skiff testified that Plaintiff made no complaint of emotional injury to her prior to her leaving Nirvana. *See id.* Ms. Skiff also confirmed that the substance of Plaintiff's complaint is contained in her medical record. *See id.* At her deposition, Ms. Skiff testified that Plaintiff had "been depressed, she was having panic attacks, she wasn't being able to sleep at night, and she said it had been since she left employment at Nirvana with the sexual harassment that went on at Nirvana." Dkt. No. 38-15 at 14.

During her employment at Nirvana, Plaintiff made several visits to the doctor. *See id.* at ¶ 28. Plaintiff sought treatment for various conditions, largely stemming from her asthma and tobacco use. *See id.* Defendants assert that, at no point during her employment did Plaintiff complain of nausea, vomiting, or emotional distress, and that she never mentioned sexual harassment to any medical professional during her time of employment. *See* Dkt. No. 38 at ¶ 28.[2]

On March 7, 2012, Plaintiff sought medical treatment and claimed to have vomited every day for six months, after most meals and sometimes in between. *See* Dkt. No. 53 at ¶ 29. At her visit three and one-half months earlier, Plaintiff did not report these symptoms, but merely discussed her asthma. *See id.* The medical record from March 7, 2012 recites that Plaintiff "'has had increased depression, anxiety and nervousness since resigning from her job due to sexual harassment.'" *Id.* (citing Dkt. No. 38-13 at 16-17).

Plaintiff's complaint states that "Defendant RAFIZADEH's consistent unwanted sexual advances became so frequent and offensive that they were making Plaintiff MEALUS physically ill on a daily basis." Dkt. No. 1 at ¶ 40. During her deposition, Plaintiff indicated that Defendants' conduct was the sole cause of her illness. *See* Dkt. No. 38-3 at 66. On February 15, 2012, several days after her employment ended at Nirvana, Plaintiff wrote the following on Facebook: "This might be TMI but I must share . . . I went out with a guy for almost 6 months and for over 4 of those . . . months his ex caused utter chaos in our lives and he let it happen and I was so upset that I got sick every day for 4 months . . . well I ended it a little over a week ago and today for the first day in 4 months I did not throw up!!! YAY ME!!!!!" Dkt. No. 38-19 at 13. Five days later, Plaintiff wrote that she and her boyfriend had worked out their problems. *See id.*

---

[2] Plaintiff denies the "statement that Plaintiff never mentioned sexual harassment to a medical professional since Defendant's exhibit is only the notes and not an independent recollection of what Plaintiff [c]omplained of or did not complain of." Dkt. No. 53 at ¶ 28.

In July of 2012, Plaintiff characterized her relationship with her now exboyfriend as a "10 month long nightmare[.]" *Id.* at 23.[3]

Plaintiff has alleged that she took Lexapro from 2010 through 2012 even though she did not have a prescription for the drug. *See* Dkt. No. 53 at ¶ 33. Plaintiff testified that she obtained Lexapro from her mother, as her mother had a prescription for it and health insurance. *See id.* Plaintiff claims that she gave her mother money for the drug. *See id.*

On March 19, 2013, Plaintiff commenced this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL"). *See* Dkt. No. 1. Plaintiff's complaint contains the following causes of action: (1) Title VII hostile work environment; (2) Title VII retaliation; (3) NYSHRL discrimination; (4) NYSHRL retaliation; and (5) common law assault. *See generally id.*

Currently before the Court are Defendants' motions for summary judgment. *See* Dkt. Nos. 38 & 39.

## III. DISCUSSION

**A.    Standard of review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at

---

[3] Plaintiff denies "Defendant's insinuation that Plaintiff's emotional state was caused by her romantic relationship." Dkt. No. 53 at ¶ 32.

36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.**    ***Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005)**

In *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), the plaintiff was arrested in the course of a robbery, pleaded guilty to criminal charges, and then brought an action against the arresting officers and their employer alleging that they had used excessive force in effecting his arrest.  The plaintiff asserted that the officers had beaten him after he surrendered and then threw him from a third-story window.  The officers denied this and all testified that the plaintiff had attempted to escape by jumping from the window.  The defendants moved for summary judgment, which was granted by the district court, and the plaintiff appealed, arguing that a material question of fact existed in the conflicting versions of events presented by the plaintiff

and the defendants. *See id.* at 551–53.

On appeal, the Second Circuit Court of Appeals noted that conflicting testimony concerning a material issue of fact generally presents issues of credibility which can only be resolved by a fact-finder at trial. *See Jeffreys*, 426 F.3d at 554. On a motion for summary judgment, however, the party opposing the motion is required to do more than offer opposing conclusory or speculative statements. *See id.* (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir.1998)) (holding that a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful"). Upholding the district court's decision, the Second Circuit found that (1) nothing in the record supported the plaintiff's allegations "other than plaintiff's own contradictory and incomplete testimony," and (2) "no reasonable person could believe Jeffreys' testimony." *Id.* at 555 (internal quotation marks omitted).

For the *Jeffreys* exception to apply, the following conditions must be present: (1) the plaintiff must rely almost exclusively on his own testimony; (2) the plaintiff's testimony must be contradictory or incomplete; and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *See id.* The Second Circuit has made clear that the exception set forth in *Jeffreys* is only appropriate in extraordinary circumstances, and "'if there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (quoting *Jeffreys*, 426 F.3d at 555 n.2). "However, in certain extraordinary cases, where 'the facts alleged are so contradictory that doubt is cast upon their plausibility, the court may pierce the veil of the complaint's factual allegations and dismiss the claim.'" *Id.* (quotation omitted). "To hold otherwise, and require district courts to allow parties to defeat

summary judgment simply by testifying to the allegations in their pleadings (or, as here, to facts not alleged in their pleadings), would 'license the mendacious to seek windfalls in the litigation lottery.'" *Id.* (quoting *Arrington v. United States*, 473 F.3d 329, 444 (D.C. Cir. 2006)).

## C.      Title VII Claims

### 1. Hostile Work Environment

"In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gorzynski v. JetBlue Airways Co.*, 596 F.3d 93, 102 (2d Cir. 2010) (quotation omitted). "A plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Id.* (citation omitted). "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* (citation omitted). Moreover, the alleged hostile work environment must have been created by conduct relating to a characteristic protected by Title VII. *See Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001) (citations omitted).

"Beyond demonstrating a hostile work environment, a plaintiff must show a basis for imputing the objectionable conduct to the employer." *Gorzynski*, 596 F.3d at 103 (citation omitted). "When . . . the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer." *Id.* (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Faragher v. City of*

*Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)).

It has been repeatedly held that "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not objectively severe enough to establish a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). The test not only looks at isolated incidents, but requires consideration of all the circumstances present in the workplace contributing to its environment, such as the amount that the alleged conduct interferes with an employee's work performance, its frequency, severity, and threatening nature. *See Harris*, 510 U.S. at 23.

In the present matter, the Court agrees with Defendants that Plaintiff has relied almost exclusively on her own testimony to support her claims, that the testimony is both contradictory and incomplete, and that Plaintiff's testimony is contradicted by the evidence in the record. For example, in her complaint Plaintiff contends that, on February 8, 2012, "after finishing her lunch break, Defendant RAFIZADEH began screaming at Plaintiff MEALUS for leaving a book on a counter in the lab, something that was not against the rules and would likely not have been considered improper behavior had it been done by a male employee. After Defendant RAFIZADEH stop[ped] his screaming tirade, Plaintiff MEALUS went to the bathroom, threw up, and quit her job. At that point, she was physically and emotionally unable to withstand the constant unlawful abuse perpetrated by Defendant RAFIZADEH." Dkt. No. 1 at ¶ 51. In her email dated February 9, 2012, Plaintiff paints a different story. Specifically, Plaintiff indicated that "Mansur let me go today after almost 5 years of dedicated service. He kept a girl that has been there 1 day instead." Dkt. No. 38-2 at 2.

Additionally, in her deposition, Plaintiff claimed that, after she found out that her employment offer at Barrett Paving had been revoked, she did not inquire about keeping her

position at Nirvana.  *See* Dkt. No. 38-3 at 155-56.  Again, this position is directly contradicted by

Plaintiff's February 9, 2012 email in which she indicates that Defendant Rafizadeh let her go in

favor of a new hire.  *See* Dkt. No. 38-2 at 2.  Additionally, in her affidavit, Ms. Hellinger

indicates that when Plaintiff told her that the offer of employment with Barrett Paving had been

revoked, she was obviously distraught and upset.  *See* Dkt. No. 38-4 at 5.  When Plaintiff

indicated that she did not know what she was going to do, Ms. Hellinger informed her that she

had given her notice, her position was already filled, and that they were already training her

replacement.  *See id.*  After Plaintiff called Defendant Rafizadeh, she returned, screamed,

slammed the door, cursed, collected her belongings and left.  *See id.*

        In Plaintiff's complaint, she alleged the following: "Defendant RAFIZADEH consistent

unwanted sexual advances became so frequent and offensive that they were making Plaintiff

MEALUS physically ill on a daily basis. . . .  Because of the daily stress and a nervous condition

that she developed due to Defendant RAFIZADEH's constant unwanted sexual advances that

included throwing up on a daily basis, Plaintiff MEALUS started taking anti-anxiety medicine

just to be able to physically and mentally endure her employment with Defendants."  Dkt. No. 1

at ¶¶ 40, 43.  In her deposition, Plaintiff testified that apart from the issues at Nirvana, nothing

else was going on in her life that impacted her emotional condition.  *See* Dkt. No. 38-3 at 65.

Despite alleging that Defendants' conduct was the sole cause of her alleged illness, Plaintiff wrote

the following on Facebook on February 15, 2012, one week after her employment with Nirvana

ended: "This might be TMI but I must share . . . I went out with a guy for almost 6 months and

for over 4 of those . . . months his ex caused utter chaos in our lives and he let it happen and I

was so upset that I got sick every day for 4 months . . . well I ended it a little over a week ago and

today for the first day in 4 months I did not throw up!!!  YAY ME!!!!!"  Dkt. No. 38-19 at 13.

Five days later, Plaintiff wrote that she and her boyfriend had worked out their problems.  *See id.* In July of 2012, Plaintiff characterized her relationship with her now exboyfriend as a "10 month long nightmare[.]" *Id.* at 23; *see also* Dkt. No. 38-6 at 7.  Again, the evidence presented directly contradicts Plaintiff's testimony and allegations in her complaint.[4]

Again, Plaintiff's complaint paints her emotional suffering at Nirvana as unbearable, yet prior to commencing this lawsuit, there is no evidence that Plaintiff ever complained of emotional suffering at her many medical visits.  On March 7, 2012, Plaintiff informed her doctor that she vomited every day for six months, after most meals and sometimes in between.  *See* Dkt. No. 38-13 at 15.  At her visit on November 29, 2011, three months and eight days earlier – and before she left Nirvana – Plaintiff specifically denied these same symptoms.  *See id.* at 11 ("Denies: Abdominal pain, Bloating, Food intolerance, Nausea, Vomiting, Dysphagia, Reflux/heartburn, Change in bowel habits, Constipation, Diarrhea, Black stools, Bloody stools").  During her deposition, when Plaintiff was asked why she did not make any complaints about nausea or vomiting to her doctor in the months leading up to February 8, 2012, Plaintiff claimed that she had not seen her doctor during that time.  *See* Dkt. No. 38-3 at 64-65.

Additionally, Plaintiff repeatedly expressed positive feelings about Nirvana during her employment with the company.  *See* Dkt. No. 5.  Far from expressing concerns about sexual harassment to her supervisors, Plaintiff wrote in an October 28, 2011 email to Mozafar Rafizadeh the following: "I really like working here and love the job that I do but $10.50 is just simply not

---

[4] Plaintiff also alleged that she had taken Lexapro to deal with her emotional conditions while at Nirvana, even though she did not have a valid prescription.  *See* Dkt. No. 38-3 at 55. Plaintiff testified that she obtained the Lexapro from her mother, as her mother had a prescription for it and health insurance, which Plaintiff did not.  *See id.* at 59-60.  Plaintiff claimed that she gave her mother money for the medicine.  *See id.*  Plaintiff's mother, however, contradicted this story, testifying that she had never given Plaintiff Lexapro, never shared her prescription, and never received money from Plaintiff for it.

enough to live on when trying to raise a teenager." *Id.* at 2. In another email to Ms. Hellinger dated January 5, 2012, Plaintiff complained about the training new employees receive at Nirvana. *See id.* at 5. Plaintiff asked to be placed on the day shift so that she would not have to look for another job, and claimed that, "unlike most people here, [I] like my job here." *Id.*

Moreover, Plaintiff even recommended that her best friend, Ms. Gorczyca, apply for a job with Nirvana. *See* Dkt. No. 38-11 at 25. In her application, Ms. Gorczyca indicated that the reason she was applying for the position was because she "had heard very good things about the company." *Id.* At her deposition, Ms. Gorczyca was asked the following question, and provided the following answer:

> Q. Prior to the time that you went to work at Nirvana, what had Cherie told you about Nirvana?
>
> A. That Mansur is a dirty, old man but she dealt with it – you know.

Although Ms. Gorczyca continues to make vague and conclusory allegations of inappropriate conduct, the conduct was not directed towards Plaintiff and certainly does not rise to the level of hostile work environment. The one specific incident Ms. Gorczyca witnessed involved Defendant Rafizadeh "trying to touch and rub Cherie's arm while they were walking in the plant. And Cherie would walk a little bit ahead, and he was just trying to rub her arm, grabbing her elbow or her shoulder, stuff like that." *Id.* at 63-64. Ms. Gorczyca testified that she did not observe Plaintiff attempt to move away from this contact. *See id.* at 65-66. Additionally, Ms. Gorczyca testified that, aside from the above incident, she had never witnessed any employee of Nirvana, including Mansur and Mozafar, treat any other women in a manner that she thought was inappropriate. *See id.* at 71-72.

Regarding the email sent to Mansur and Mozafar dated February 9, 2012, Plaintiff takes

issue with Defendants' characterization of the letter as threatening and an attempt at extortion. *See* Dkt. No. 53 at ¶¶ 12-13. Plaintiff claims that the email was simply a layperson attempting to settle her sexual harassment case on her own without the assistance of an attorney. *See id.* at ¶ 13. Plaintiff asserts that "[i]f an attorney made the same implications relating to sexual harassment claims it would be considered a demand for settlement and protected by litigation privilege, as it should be here. In fact, Plaintiff Mealus made her intent to seek settlement clear when she stated within the cited e-mail . . . that the amount she seeks from Defendant is significantly less than the amount she would seek in a suit for the[ ] 'treatment she received at Nirvana.'" *Id.* Additionally, Plaintiff denies that this was an attempt at extortion "because the statements relating to water samples are never directly connected to any request for money." *Id.*

The Court finds that Plaintiff's arguments regarding her email are entirely without merit. First, Plaintiff's argument that the "statements relating to water samples are never directly connected to any request for money" is at best disingenuous. Immediately following Plaintiff discussing the pictures of the dirty water samples and that she is prepared to send the pictures to all the state health departments and companies that Nirvana does business with, she then demands $5,000, that Defendants' not deny her unemployment benefits, and then issues the following threat: "I want that within on[e] week from today or this all goes public." Dkt. No. 38-2 at 3. Although Plaintiff may not be an attorney and does use the word "settlement" in the email, the quoted language is clearly a threat that she will go public with her pictures of dirty water samples unless she gets $5,000 and unemployment. Had Plaintiff not spent such a significant portion of the email discussing the pictures she has and all the ways that she can disseminate them, Plaintiff's interpretation may have been plausible.

Additionally, several individuals witnessed Plaintiff taking pictures of water samples and

inquired why she was doing it.  According to Mr. Rocker, "[o]n several occasions she came from the lab, back to the pallet area, and pulled out petrie dishes, loaded with mold and spots.  She said they looked like that because she had left them in the incubator for a week, and said, in substance 'you know what I could do with these?  I could shut this whole place down.  All I have to do is make one phone call to the state or the health department.'  She told me she was taking pictures of these things in case anything ever happened to her; if she lost her job here, or got messed up in anyway."  *See* Dkt. No. 38-4 at 11.  According to George Zehr, Plaintiff informed him that she was taking pictures, but did not tell him of what.  *See id.* at 16.  This comment was made during a conversation in which Plaintiff was "putting down the place."  *Id.*  Moreover, according to Leo Hellinger, a supervisor with Nirvana, "[o]n one occasion she showed me two dishes with really bad things in them.  She told me that she had kept these for a week.  She told me that she had a relative who could make a big issue of this.  I later learned she had taken a number of pictures of such things with her cell phone.  She had said and shown this to me about six months before she left.  I thought little of it, since a lab worker can do whatever she might want, and I know that Nirvana's water is tested weekly outside the plant to assure safety to the public."  *Id.* at 20-21.  Again, Mr. Hellinger claims that Plaintiff informed him that the evidence regarding dirty water samples was her insurance policy if she was fired or simply needed a job.  *See id.* at 21.

Plaintiff's conclusory and contradictory statements are simply insufficient to withstand Defendants' motion for summary judgment.  In response to Defendants' statement of material facts, Plaintiff identifies the following individuals as having been sexually solicited, approached, or harassed by Mansur Rafizadeh: "Heather Gorczyca, Alyssa Johnson, Gail (last name unknown), Terry (last name unknown), Clara (last name unknown), DeeDee (last name unknown), Deb (last name unknown), Christy Wilcox, Penny Levensailor, Mary Burr, Kim

Matusczak, and Bridgette Hunter." Dkt. No. 53 at ¶ 26. Although these women may very well have been subjected to sexual harassment while employed by Nirvana, Plaintiff's conclusory and unsupported assertion is insufficient in opposing a motion for summary judgment. Further, the only person Plaintiff has identified as having witnessed any sexual advance or sexually related comment by Mansur Rafizadeh is Heather Gorczyca, Plaintiff's best friend. *See id.* As discussed, the one incident Ms. Gorczyca witnessed falls far short of establishing a hostile work environment. Although Plaintiff complains that these incidents involving Defendant Rafizadeh occurred on an almost daily basis, of the approximately 130 people who work for Nirvana, only Ms. Gorczyca witnessed a single incident involving Plaintiff and Defendant Rafizadeh.

Finally, the evidence submitted by Defendants show that Plaintiff regularly participated in the conduct that she now claims created the hostile work environment. According to Mr. Hellinger, Plaintiff spent a considerable amount of time with two other male workers in "the palletizer area. She was constantly there, laughing, joking with those workers. She was very open about her bar experiences, people she had met, things she had done. Her language was late Saturday night barroom style. We were working nights here, and she obviously felt there would be no repercussions from such talk. She openly spoke about sexual topics." Dkt. No. 38-4 at 19-20. Additionally, Mr. Hellinger stated that he overheard Plaintiff discussing a sexual encounter with a guy she had met at a bar during which Plaintiff provided explicit details. *See id.* Moreover, Mr. Hellinger claims that Plaintiff would wear clothing that was not in compliance with the dress code and that she was flattered by the attention she received. *See id.* at 20. Mr. Hellinger also observed Plaintiff "standing on the grated floor, above the men, opening her shirt and giving the men a complete view of herself." *Id.* Mr. Zehr recalls a situation in which Plaintiff made him uncomfortable when she "rubbed against him with her breasts." *Id.* at 16.

Additionally, Mr. Rocker described Plaintiff as wearing clothing that was inappropriate and displayed too much of her body. *See id.* at 9. Mr. Rocker claims that Plaintiff would wear "a V neck sweatshirt that she had cut herself, stand in front of people, bend over, and display herself." *Id.*

Defendants also provided an affidavit from Francis Wilbert Rocker, III. *See* Dkt. No. 38-4 at 8. Mr. Rocker has worked at Nirvana for the past eight years and has known Plaintiff for about six years. *See id.* According to Mr. Rocker, Plaintiff would generally tell him about her weekends on Mondays. *See id.* at 9. In one instance, Plaintiff recounted how she had met a guy at a bar, had drinks with him, and then went back to her place. *See id.* Mr. Rocker stated that Plaintiff told him that "'his dick was as big as a mini-bic lighter.'" *Id.* Moreover, Mr. Rocker indicated that Plaintiff's "demeanor around the plant was very free and open" and that she did not demonstrate any work related distress. *See id.* Mr. Rocker stated that Plaintiff would often "smile, flip her hair" and that she wore inappropriate clothing that displayed too much of her body. *See id.* Further, Mr. Rocker claims that Plaintiff would often wear a "V neck sweatshirt that she had cut herself, stand in front of people, bend over, and display herself." *Id.* Mr. Rocker further stated that Plaintiff would often discuss problems she had in her life, such as with her boyfriend and the mental health of her niece. *See id.* at 9-10. Mr. Rocker claims that, despite these daily conversations, not once did she complain about Defendant Rafizadeh or the conditions at Nirvana, other than the "ordinary workplace griping." *See id.*

In order to prevail on her hostile work environment claim, Plaintiff must establish that the conduct was unwelcome. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir. 1993). As the record makes clear, Plaintiff actively participated in and contributed to the objectionable and inappropriate conduct about which she now complains. *See also Heba v. New*

*York State Div. of Parole*, 537 F. Supp. 2d 457, 468 (E.D.N.Y. 2007) (holding that the defendant cannot be said to have "created a hostile work environment directed at Plaintiff when Plaintiff himself participated in objectionable conduct of like kind, contributing to what appears to be a workplace atmosphere generally permissive of inappropriate jesting").

Even if this action did not warrant dismissal under the exception in *Jeffreys*, the undisputed facts clearly show that Plaintiff has fail to produce sufficient evidence to demonstrate that the workplace was "'permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment.'" *Gorzynski*, 596 F.3d at 102 (quotation omitted). Even if the Court were to find that the environment was objectively hostile and abusive, which it does not, the evidence also makes clear that Plaintiff did not subjectively perceive the environment to be abusive. *See id.* (citation omitted); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (indicating that the plaintiff's behavior may be considered in evaluating whether the conduct was unwelcome). Plaintiff has made only conclusory allegations, regarding sporadic incidents, many of which were not abusive and cannot be said to have occurred because of Plaintiff's sex.

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiff's Title VII hostile work environment claims.


### 2. Retaliation

Courts analyze claims of Title VII retaliation according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (citation omitted). To make out a *prima facie* case of retaliation

under Title VII, a plaintiff must plausibly allege that: "'(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer.'" *Gordon v. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (quotation omitted). "Protected activity" includes any "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Proof of causation can be shown either indirectly through circumstantial evidence, or "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon*, 232 F.3d at 117. In order to show a retaliatory motive by means of circumstantial evidence, there must be temporal proximity between the adverse employment action and the protected activity. *See Muhammad v. Juicy Couture/Liz Clairborne, Inc.*, No. 09-Civ-8978, 2010 WL 4032735, *6 (S.D.N.Y. July 30, 2010).

When a plaintiff claims retaliation for filing previous complaints of discrimination, such complaints "are protected activity even when the underlying conduct complained of *was not in fact unlawful* so long as [the plaintiff] can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Amin v. Akozo Nobel Chems., Inc.*, 282 Fed. Appx. 958, 961 (2d Cir. 2008) (internal quotations omitted).

In *Amin*, the Second Circuit found that the plaintiff met his burden of establishing retaliatory motive through evidence that he (1) repeatedly complained about discrimination and racism by the employer, (2) was instructed to stop making such complaints, (3) persisted in making such complaints, and (4) was fired shortly after one such complaint. *See id.* at 962. Even though the defendant claimed that the plaintiff was fired for "insubordinate behavior and difficulty in working effectively with others," the court held that the proffered reasons for the

plaintiff's termination may have been pretextual, and the plaintiff fulfilled his burden of showing

that "the employment decision of which he complains 'was more likely than not motivated, in

whole or in part,' by unlawful reasons." *Id.* (quotation omitted).

In the present matter, Plaintiff alleges that she "rejected Defendant's advances consistently

and was constantly belittled, insulted and shouted at by Defendant Rafizadeh. The fact that the

same individual perpetrating the harassment was also the individual who retaliated by treating

Plaintiff with hostility creates a connection between the cause and effect." Dkt. No. 51 at 17.[5]

Contrary to Plaintiff's assertions, the Court finds that Plaintiff has failed to make out a

---

[5] An issue not directly raised by either side is whether declining or rebuffing a harasser's
sexual advances constitutes a "protected activity" under Title VII retaliation jurisprudence. The
Second Circuit has specifically declined to rule on whether resisting an employer's sexual
advances constitutes "protected activity" for purposes of retaliation. *See Fitzgerald v. Henderson*,
251 F.3d 345, 366 (2d Cir. 2001). The district courts are split on this issue. The courts that have
found that an employee's refusal to submit to sexual advances constitutes "protected activity" base
their finding on the reasoning that opposing sexually harassing behavior constitutes "oppos[ing]
any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a).
Because sexual harassment is an unlawful employment practice, and an employee's refusal is a
means of opposing such behavior, that refusal should constitute a "protected activity." *Laurin v.
Pokoik*, No. 02-CV-1938, 2005 WL 911429, *4 (S.D.N.Y. Apr. 18, 2005); *Roberts v. County of
Cook*, No. 01-C-9373, 2004 WL 1088230, *4 (N.D. Ill. May 12, 2004); *Little v. NBC*, 210 F.
Supp. 2d 330, 386 (S.D.N.Y. 2002); *Lange v. Town of Monroe*, 213 F. Supp. 2d 411, 420
(S.D.N.Y. 2002). The courts that have declined to find that refusal of sexual advances constitutes
a protected activity have held that "even the broadest interpretation of a retaliation claim cannot
encompass instances where the alleged 'protected activity' consists simply of declining a
harasser's sexual advances, which is all that is alleged here by way of 'protected activity.' If it
were otherwise, every harassment claim would automatically state a retaliation claim as well."
*Del Castillo v. Pathmark Stores, Inc.*, 941 F. Supp. 437, 438-39 (S.D.N.Y. 1996); *Fitzgerald v.
Henderson*, 36 F. Supp. 2d 490, 499 (N.D.N.Y. 1998), *aff'd in part, rev'd in part on other
grounds*, 251 F.3d 345 (2d Cir. 2001); *Rashid v. Beth Israel Med. Ctr.*, No. 96 Civ. 1833, 1998
WL 689931, *6 (S.D.N.Y. Oct. 2, 1998).

Although the Court is inclined to agree that simply refusing a sexual advance does not
constitute a "protected activity" for purposes of Title VII, the Court will assume for purposes of
this case that it is sufficient.

prima facie case of retaliation. As set forth above, Plaintiff's contradictory and conclusory

allegations regarding Defendant Rafizadeh's conduct towards her are almost entirely refuted by

the evidence submitted by Defendants. Even assuming that Defendant Rafizadeh belittled,

insulted, and shouted at Plaintiff, the evidence submitted fails to demonstrate any causal

connection between such actions and any alleged protected activity. In her EEOC complaint,

Plaintiff alleges that, "[a]fter throwing up her lunch in the bathroom from the stress that Mr.

Rafizadeh was causing her, Complainant was forced to quit, thus constituting a constructive

discharge." Dkt. No. 38-17 at ¶ 34 (emphasis omitted). As discussed, however, the evidence

clearly establishes that Plaintiff quit her job not because of Defendant Rafizadeh's alleged

conduct, but rather because she believed that she was going to work at Barrett Paving and make

more money. As such, Plaintiff failed to demonstrate that Defendants took an adverse

employment action against her. *See Chuang v. T.W. Wang Inc.*, 647 F. Supp. 2d 221, 230–31

(E.D.N.Y. 2009) (holding that the employer's proffered reason for termination of the plaintiff's

employment — his own voluntary resignation — was legitimate and nondiscriminatory, and no

reasonable trier of fact could conclude that discrimination was the real reason for plaintiff's

termination). Moreover, at best, the evidence demonstrates that Defendant Rafizadeh

occasionally yelled at Plaintiff regarding the performance of her job, which is insufficient to

establish actionable conduct under Title VII. *See Farragher v. Boca Raton*, 524 U.S. 775, 788

(1998) (holding that "the sporadic use of abusive language" is part of "the ordinary tribulations of

the workplace" and not actionable). Even though Plaintiff may believe that Defendants' actions

were wrongful or even spiteful, the courts have repeatedly emphasized that "Title VII is not a

general 'bad acts' statute." *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 135 (2d Cir.

1999) (quotation and other citation omitted); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560,

566 (2d Cir. 2000) (holding that "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination" (quotation and other citation omitted)); *see also Montanile v. National Broadcast Co.*, 211 F. Supp. 2d 481, 488 (S.D.N.Y. 2002) (holding that "[c]omplaints regarding violation of employer policies unrelated to impermissible discrimination do not fall within the scope of Title VII, and, therefore, do not qualify for protection under the statute").

Additionally, Plaintiff has failed to identify the approximate date of any alleged incident in which she refused a sexual advance by Defendant Rafizadeh. As such, Plaintiff has failed to establish that the alleged protected activity was followed closely by the alleged adverse employment action sufficient to establish a causal connection. *See Blanco v. Brogan*, 620 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2009) (citing *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir. 1986)).

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiff's Title VII retaliation claim.

**D.      Common Law Assault**

Defendants argue, and Plaintiff concedes, that Plaintiff's common law assault claim is barred by the applicable one-year statute of limitations. *See* Dkt. No. 38-1 at 22; Dkt. No. 51 at 17-18. Since Plaintiff's complaint was filed more than one year after she left her employment with Nirvana, and because the filing of an EEOC complaint does not toll the limitations period for state-law claims arising from the same events, the Court grants Defendants' motions for summary judgment as to Plaintiff's assault claim. *See Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355, 370-71 (W.D.N.Y. 2010) (citations omitted).

**E.      HRL Claims**

   *1. Hostile Work Environment and Retaliation*

   Hostile work environment and retaliation "claims under the HRL are evaluated using the same analytical framework used in Title VII actions." *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012); *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 610 (2d Cir. 2006) (holding that "[h]ostile work environment and retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII") (citations omitted).

   Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiff's New York State Human Rights Law hostile work environment and retaliation claims.


   *2. Aid and Abet*

   While an individual employee is not ordinarily subject to suit under the HRL, "[u]nder the aiding and abetting provision of NYHRL, an individual employee who actually participates in the conduct giving rise to a discrimination claim may be held personally liable." *Miotto v. Yonkers Pub. Sch.*, 534 F. Supp. 2d 422, 427 (S.D.N.Y. 2008); *see also* N.Y. EXEC. LAW § 296(6) (McKinney 2013) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article").  In claims regarding the actions of a supervisor, a plaintiff need not allege that the said supervisor personally carried out the discriminatory conduct.  *See Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 384 (S.D.N.Y. 1999).  "Rather, the case law establishes beyond cavil that a supervisor's failure to take adequate remedial measures can rise to the level of 'actual participation' under HRL § 296(6)."  *Id.*

   Since the Court has found that Defendants are entitled to summary judgment as to all of

the alleged primary violations, Defendant Rafizadeh is entitled to summary judgment on Plaintiff's aiding and abetting claim. *See International Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 363 (S.D.N.Y. 2007) (dismissing the plaintiff's aiding and abetting claim brought pursuant to N.Y. Exec. Law § 296(6) because "accessory liability may only be found where a primary violation has been established") (citations omitted).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motions for summary judgment (Dkt. Nos. 38 and 39) are **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 16, 2014
      Albany, New York

Mae A. D'Agostino
U.S. District Judge