UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

Cherie Mealus,
                    Plaintiff,
vs.

Nirvana Spring Water, Inc.
Mansur Rafizadeh,
                    Defendants.
_____

Civil Action No:
7:13-CV-0313
( M A D / D E P )

---

# MEMORANDUM OF LAW
# IN SUPPORT OF DEFENDANT RAFIZADEH'S
# MOTION FOR SANCTIONS

---

**Richard Pertz, Esq.**
**12280 State Route 365**
**Remsen, NY 13438**
**(315) 732-4900**
**rpertz@gmail.com**

# CONTENTS

AUTHORITIES ............................................................................................................. 3

PRELIMINARY STATEMENT ................................................................................... 4

PROCEDURAL BACKGROUND .............................................................................. 5

CERTIFICATION OF COMPLIANCE WITH FED. R. CIV. P. 11 ....................... 5

STANDARD FOR SANCTIONS ............................................................................... 6

   Jurisdiction ................................................................................................................ 6

   Rule 11 ....................................................................................................................... 6

   Section 1927 and the Court's Inherent Power ..................................................... 7

ARGUMENT ................................................................................................................. 8

   I. THIS CLAIM, BROUGHT IN BAD FAITH, IS SANCTIONABLE ............. 8

      1. This Lawsuit Was Brought as Part of an Extortion Scheme ...................... 8

      2. The Claim Does Not Have a Colorable Basis ............................................... 9

      3. Plaintiff's Counsel's Response to Our Notice of Motion Does Not Constitute Withdrawal of the Offending Claims under Rule 11 ...................................... 10

   II. PLAINTIFF'S COUNSEL'S CONDUCT IS SANCTIONABLE ...................11

      1. Plaintiff's Counsel Pursued the Case Without Properly Investigating .........11

      2. Plaintiff's Counsel Soon Became Aware of the Bad-Faith Nature of the Claim, and Continued Anyway .......................................................................... 13

      3. Plaintiff's Counsel Abetted the Bad-Faith Claim by Failing to Disclose Evidence .................... 19

CONCLUSION ............................................................................................................. 21

# <u>AUTHORITIES</u>

**Statutes and Rules**

28 U.S.C. § 1927..................................................................................................................7-8, 11
Fed. R. Civ. P. 11...................................................................................................................6-7

**Cases**

*Caisse Nationale de Credit Agricole-CNCA v. Valcorp, Inc.*, 28 F.3d 259 (2d Cir. 1994).....................11
*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991)..................................................................7
*Childs v. State Farm Mutual Automobile Insurance Co.*, 29 F.3d 1018 (5th Cir. 1994).........................14
*Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384 (1990)...................................................6
*DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998).........................7
*Enmon v. Prospect Capital Corp.,* 675 F.3d 138 (2d Cir. 2012).................................................7
*Fuerst v. Fuerst*, 832 F. Supp. 2d 210 *(E.D.N.Y. 2011)*...............................................18
*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005)........................................................19
*Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 549 (5th Cir. 2001)................................13
*Nassau-Suffolk Ice Cream, Inc. v. Integrated Res., Inc.*, 114 F.R.D. 684 (S.D.N.Y. 1987).....................11
*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986)................................................................8
*Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323 (2d Cir.1999)...........................................*passim*
*Star Mark Mgmt. v. Koon Chun Hing Kee Soy & Sauce*, 682 F.3d 170 (2d Cir. 2012)..........................6
*United States v. Int'l Bhd. of Teamsters,* 948 F.2d 1338 (2d Cir. 1991)....................................11
*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110 (2d Cir.2009)..............................7

**Other Authorities**

Rules of Professional Conduct of the State of New York, §§ 1.16, 3.3, 3.4...............................14, 15, 18
Melissa L. Stuart, *A Young Lawyer's Guide to Rule 11 Sanctions*, American Bar Association, June 20, 2012......................................................................................................................11

**"Defendant RAFIZADEH's consistent unwanted sexual advances became so frequent and offensive that they were making Plaintiff MEALUS physically ill on a daily basis."**
        **-Complaint, signed by Jesse Rose, Esq., March 19, 2013**

**"This might be TMI but I must share...I went out with a guy for almost 6 months and for over 4 of those his months his ex caused utter chaos in our lives and he let it happen and I was so upset that I got sick every day for 4 months...well I ended it a little over a week ago and today for the first day in 4 months I did not throw up!!! YAY ME!!!!!"**
        **-Cherie Mealus, Facebook post, Feb. 15, 2012**

**"I have personally looked through this [Cherie Mealus's Facebook] account and found nothing related to Plaintiff's employment with Defendants or this pending lawsuit, and accordingly anything responsive to Defendants' requests."**
        **-Jesse Rose, Esq., letter of Oct, 14, 2013**

This was an abusive lawsuit. Cherie Mealus sued Mansur Rafizadeh not because she believed she was sexually harassed, but because she needed money after she left her job, and wanted to punish her former employers for not paying her to keep silent. She filed a false complaint, testified falsely under oath, and threatened the Defendants with the publication of pictures that could harm their business, a scheme that she thought up well in advance and considered an "insurance policy" if she ever lost her job. Plaintiff left enough of a record to expose her bad faith, and this Court granted summary judgment for Defendants.

Plaintiff did not attempt to defraud the Court on her own. She was enabled by lawyers whose lack of diligence, combined with their knowledge of her illicit acts, rose to the level of sanctionable conduct. Mr. Rose and Mr. Kennedy were not unsuspecting pawns of their client. They kept her revealing Facebook posts concealed, put the power of a federal court proceeding behind an extortion scheme without ever seriously investigating, and refused to withdraw the action even when evidence of Plaintiff's criminality was staring them right in the face. They accused Mansur of gross sexual misconduct in bold-face type, made him answer intimate sexual questions under oath, and cost him and his brother tens of thousands of dollars in legal fees, without so much as subpoenaing a single witness

or visiting the work site. They alleged the existence of witnesses who actually witnessed nothing—something they would have known, had they ever contacted them in the first place. In the face of medical records that indicated no emotional injury during Plaintiff's employment and a sudden report of symptoms after Plaintiff had announced this lawsuit, they made a seven-figure claim for emotional damages, threatening the Rafizadehs with the destruction not just of their reputations but of their business as well.

Whatever the damage to Mansur and Mozafar, the bigger victim of Plaintiff's counsel's conduct may have been their own client. At the time of her deposition, Cherie Mealus was under criminal investigation for her extortion threat. Having been told by defense counsel that Defendants had gone to law enforcement at the Rule 16 conference, Plaintiff's counsel did not inform their client. They did not research her possible criminality or follow up as to the status of the investigation, watching as she waived her Fifth Amendment rights, went under oath, and gave perjured testimony. Mr. Rose and Mr. Kennedy knew their client was accused of committing a crime, had seen the February 9 email and the blackmail pictures, and their response was to describe the situation as "laughable."

Courts do not take this kind of conduct lightly. Mansur Rafizadeh seeks attorney's fees and court costs from Plaintiff and her counsel, jointly and severally, and asks the Court to sanction Plaintiff's counsel in a way it deems proper to deter future abuse.


**PROCEDURAL BACKGROUND
AND CERTIFICATION OF COMPLIANCE WITH FED. R. CIV. P. 11**


Defendants served Plaintiff with a Notice of Motion on April 21, 2014, setting forth the grounds for this motion pursuant to the safe harbor requirement of Fed. R. Civ. P. 11(c)(2). Ex. 1. In response, Plaintiff's counsel denied that the lawsuit was brought in bad faith and declined to withdraw the complaint, offering only to modify certain statements and reduce their claim for emotional damages.

Ex. 2. They sent defense counsel an unsigned stipulation, proposing to withdraw claims "relating to the end of her employment with Defendants," but did not offer to withdraw any cause of action or discontinue the lawsuit. They never moved the Court to withdraw or modify any statements or pleadings. There was no further correspondence between the parties. The Court granted summary judgment to Defendants on September 16, 2014.  Dkt. No. 68.

## STANDARD FOR SANCTIONS

### Jurisdiction

A "District Court has jurisdiction to impose sanctions irrespective of the status of the underlying case because the imposition of sanctions is an issue collateral to and independent from the underlying case." *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 337 (2d Cir.1999) (citing *Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384, 395-96 (1990) ("a federal court may consider collateral issues after an action is no longer pending," including motions for costs, attorney's fees, contempt sanctions, and Rule 11 sanctions because they are "not a judgment on the merits of an action")). "Thus, even when a district court lacks subject matter jurisdiction over an underlying action, it still possesses jurisdiction to impose sanctions arising from the underlying case." *Schlaifer Nance*, 194 F.3d at 333 (citing cases).

### Rule 11

An attorney may be subject to sanctions under Rule 11 for presenting frivolous claims in a pleading. Fed. R. Civ. P. 11(b)(2) and (c). "The standard for triggering the award of fees under Rule 11 is objective unreasonableness and is not based on the subjective beliefs of the person making the statement." *Star Mark Mgmt. v. Koon Chun Hing Kee Soy & Sauce*, 682 F. 3d 170, 177 (2d Cir. 2012) (citations omitted). "With respect to legal contentions, the operative question is whether the

argument is frivolous, i.e., the legal position has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" *Id.*

## Section 1927 and the Court's Inherent Power

Included in a court's inherent power is the ability to "assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *DLC Management Corp. v. Town of Hyde Park*, 163 F. 3d 124 (2d Cir. 1998) (*citing Chambers v. NASCO, Inc.,* 501 U.S. 32, 45 (1991) (quotation marks and citation omitted)). "Moreover, the fact that there may be a statute or rule which provides a mechanism for imposing sanctions of a particular variety for a specific type of abuse does not limit a court's inherent power to fashion sanctions, even in situations similar or identical to those contemplated by the statute or rule." *Id.* "[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Chambers*, 501 U.S. at 50.

"In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment or delay." *Enmon v. Prospect Capital Corp*., 675 F. 3d 138, 143 (2d Cir. 2012); *see also Schlaifer Nance*, 194 F.3d at 337 (holding that a claim is "entirely without color when it lacks any legal or factual basis. Conversely, a claim is colorable when it has some legal and factual support, considered *in light of the reasonable beliefs of the individual making the claim*.") (internal citations omitted) (emphasis added). Although both findings "must be supported by a high degree of specificity in the factual findings," *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir.2009), "bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Schlaifer Nance*, 194 F.3d at 336 (citations omitted).

The showing of bad faith required to support sanctions under 28 U.S.C. § 1927 is "similar to that necessary to invoke the court's inherent power." *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986). In practice, "the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Id.*

## ARGUMENT

## I. THIS CLAIM, BROUGHT IN BAD FAITH, IS SANCTIONABLE

### 1. This Lawsuit Was Brought as Part of an Extortion Scheme

Plaintiff quit her job at Nirvana, and then when she asked to return, found that her position had been filled. Dkt. No. 68 at 3. The night of her departure, never having mentioned sexual harassment at Nirvana to anyone before, she wrote an email to the Rafizadehs: "My lawyer is ready to proceed with a very public sexual harrassment suit against Mansur and Nirvana . . . . Also I have about a hundred or so pictures of dirty micro tests from the Lab . . . . That could be very costly to your company . . . . All I am asking is that you dont [sic] deny my unemployment and want a settlement in the amount of $5000,1 thousand per year of service. I want that within on[e] week from today or this all goes public." Dkt. No. 38-2 at 3. The improper purpose here could not be clearer. Though Plaintiff attempted to pass off Ms. Mealus's late-night email as a "pro-se claim letter" (pro-se because she in fact did not have a lawyer at the time), the Court rejected that argument. The email was part of a pre-meditated attempt to make money through intimidation and criminal pressure. When blackmailing Defendants with pictures did not work, she tried to make money with a fraudulent lawsuit. Her slur of the Rafizadehs as "towel heads" added racial animus to the mix. Dkt. No. 38-20.

## 2. The Claim Does Not Have a Colorable Basis

As the Court concluded in its opinion on summary judgment, Plaintiff's claims are insufficient as a matter of law. Dkt. No. 68. Beyond that, whether or not a claim has a "colorable basis" must be "considered in light of the reasonable beliefs of the individual making the claim." *Schlaifer,* 194 F.3d at 337. Cherie Mealus did not have a reasonable belief that the facts she alleged actually happened. As the Court held, "the evidence also makes clear that Plaintiff did not subjectively perceive the environment to be abusive." Dkt. No. 68 at 22. Her numerous contradictions, her record of praising her job up until the moment she left, and the lack of a record of any mention of sexual harassment before her extortionate email of February 9, 2012 (except for one off-color joke about "a midget," Dkt. No. 38-18 at 8), leave no conclusion but that she did not believe her own story. The lack of witnesses to any sexual harassment confirms this. That her coworkers instead witnessed her exposing herself and comparing a man's genitals to a "mini-bic lighter" on the job clarify just how unreasonable her complaint was. Dkt. No. 68 at 21.

In outlining her contradictions, the Court's decision tracks the necessary findings for a lack of colorable basis. Compare, e.g., "utterly devoid of a legal or factual basis," *Schlaifer Nance*, 194 F.3d at 337, with the Court's holding that Plaintiff's arguments about her email were "entirely without merit." Dkt. No. 68 at 18. Her complaint is not colorable in light of the very first line of her February 9 email, which presents an entirely different story for her departure, confirmed by her supervisor. *Id.* at 14-15. It is not colorable when her complaint alleges that Defendant made her vomit every day and nothing else stressful was going on in her life, but she wrote on Facebook that she vomited every day because of her ex and denied these symptoms to her doctor (whom she claimed not to have seen at all at the time). *Id.* at 15-16. Her claims are objectively unreasonable in light of her repeated praise of her job (but repeated

requests for a raise), recommendation to her best friend to work there, and the lack of any witnesses to the alleged conduct in a plant that employed more than 100 people. *Id.* at 16-17, 20. Above all, her claims are not colorable because they were coupled from the outset with an extortion threat. *Id.* at 18. A colorable basis would require *some* genuine evidence to contradict the factually supported conclusion that Plaintiff invented this story on the night she left her job. Plaintiff cannot make that showing.

### 3. Plaintiff's Counsel's Response to Our Notice of Motion Does Not Constitute Withdrawal of the Offending Claims under Rule 11

In response to Defendants' Rule 11 safe harbor letter, Plaintiff sent what appeared to be an offer of compromise. Ex. 2. Plaintiff sought to dissuade Defendants from filing a motion by offering to admit that *parts* of the claim should be dismissed. The claim for $1 million in emotional damages was false. *Id.* at ¶ 5. Her story about how she left her employment was false. *Id.* at ¶ 1. Her assertion that Nirvana shipped dirty water was false. *Id.* at ¶ 12. *But*, the Court should take the rest of it at face value.

Plaintiff has now made these offending statements multiple times, in an EEOC complaint, a federal court complaint, testimony under oath, and opposition papers to a motion for summary judgment. It is hard to understand Plaintiff's position that integral parts of the story, sworn to under oath, were improper under Rule 11, but the rest was proper. The vague "stipulation," which did not actually offer to withdraw any cause of action, and the promise to seek "garden variety emotional damages at trial," were an attempt to put a friendly gloss on a position that was rotten to the core.

Had Plaintiff been serious about correcting the errors she admitted, the proper procedure was to move to withdraw the offending pleadings or papers. Rule 11 allows a party to move for sanctions unless "the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service." Fed. R. Civ. P. 11(c)(2). A party does not require the opposing party's consent to move the Court to withdraw or correct any submission that violates the rule. According to the plain text of the rule, the way to prevent a motion is to withdraw or correct the

sanctionable claim with 21 days, not to wait for the other party to sign a stipulation—the fraud, after all, is perpetuated on the court, not the party. A violating party does not shift the burden to correct the error to the moving party through a mere response letter with no further action.

Most importantly, even if we had accepted them, Plaintiff's proposed stipulation and alleged concessions did not fully address the grounds for the motion. Among other things, Plaintiff denied that the entire claim was brought in bad faith and required withdrawal. Plaintiff's counsel accused us of an "attempt to coerce" them with an "unsupported and biased opinion of Ms. Mealus's claims"—an opinion the Court nonetheless came to share in its decision on summary judgment—and, in a truly unsupported litigation tactic, they threatened to cross-move. Ex. 2 at 9. Not only was additional negotiation not required under Rule 11, it was futile in light of counsel's steadfast refusal to accept that the case was a fraud. We had presented them with evidence of Plaintiff's bad faith and repeatedly requested that they withdraw the claim over the course of a year of litigation; one more conversation was not going to accomplish what clear evidence, pleadings, written communications and a formal safe harbor letter could not.

Additionally, as the standards for the sanctions requested under § 1927 and the Court's inherent power are different from those of Rule 11, these grounds remain separate and cannot be immunized against by a plaintiff's Rule 11 response. *See, e.g., United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1346 (2d Cir. 1991).

## II. PLAINTIFF'S COUNSEL'S CONDUCT IS SANCTIONABLE

### 1. Plaintiff's Counsel Pursued the Case Without Properly Investigating

Rule 11 imposes an obligation on counsel to make a reasonable inquiry to determine the accuracy of assertions made in court filings. *See, e.g., Caisse Nationale de Credit Agricole-CNCA v.*

*Valcorp, Inc.*, 28 F. 3d 259, 264 (2d Cir. 1994). A heightened standard of caution should be heeded when a lawyer signs a pleading accusing someone of misconduct involving sex, an allegation deeply detrimental to the accused, and one that touches on such a fundamental privacy interest. The "objective unreasonableness" of counsel's inquiry here also should be judged in light of the volume of available evidence that contradicted Plaintiff's assertions.

According to the ABA, "[i]f an attorney fails to review relevant documents in the public record or available to the client, or if an attorney fails to interview witnesses, courts may sanction the attorney. Generally, where a prefiling investigation other than conversations with a client could objectively establish whether a claim is well grounded in fact, failure to do such research may result in sanctions." Melissa L. Stuart, *A Young Lawyer's Guide to Rule 11 Sanctions*, American Bar Association, June 20, 2012, http://apps.americanbar.org/litigation/committees/trialpractice/articles/spring2012-young-lawyers-guide-rule11-sanctions.html. Being misled by a client is only an excuse if the attorney could not reasonably have obtained information necessary to corroborate or refute the story. See *Nassau-Suffolk Ice Cream, Inc. v. Integrated Res., Inc.*, 114 F.R.D. 684, 689 (S.D.N.Y. 1987) ("[w]hen the attorney can obtain the information necessary to certify the validity of the claim in public fashion and need not rely solely on the client, he must do so.").

Plaintiff and her counsel were introduced over the internet. An online referral service connected her with Derek Smith, Esq., who referred the case to Phillips & Associates. Ex. 2 at 8. To determine the extent of the inquiry that followed, Plaintiff's counsel should be required to report the following to the Court:

1) when counsel first examined Plaintiff's medical records;

2) the date and time of any communication with Alyssa Johnson, Christy Wilcox, Penny Levensailor, Gail (last name unknown), (etc.), or the other witnesses they claimed had information in the interrogatory responses and in their response to our motion for summary

judgment, Dkt. No. 52-6 at 2;

3) what "prior sworn testimony" counsel evaluated before suing the case;

4) what "documentary evidence" they reviewed before suing the case;

5) if they ever visited the work site, or sent an investigator to view Nirvana, take pictures or conduct interviews.

A reasonable inquiry would have included careful evaluation of medical and testimonial evidence before representing that Plaintiff had been damaged in the amount of $2,003,042. Whatever efforts Plaintiff's counsel did undertake can be enhanced with résumé-style language—e.g., reading a single statement from Ms. Gorczyca might become, "*Evaluating documentary evidence,*" etc. But no amount of spin can justify pleading a $1 million emotional injury without looking at medical records to see if their client was actually injured. An additional $1 million for punitive damages was not a reasonable claim when they had not interviewed a single person who witnessed sexual harassment against their client. Had they had any contact with someone other than Plaintiff's best friend, whom the Court confirmed witnessed nothing actionable, they would have realized that *no* witnesses had witnessed anything actionable.

### 2. Plaintiff's Counsel Soon Became Aware of the Bad-Faith Nature of the Claim, and Continued Anyway

Section 1.16 of the Rules of Professional Conduct of the State of New York states the following in relevant part:

*Declining or Terminating Representation:*

(a) A lawyer shall not accept employment on behalf of a person if the lawyer knows or reasonably should know that such person wishes to:
(1) bring a legal action, conduct a defense, or assert a position in a matter, or otherwise have steps taken for such person, merely for the purpose of harassing or

maliciously injuring any person;

>(b) Except as stated in paragraph (d), a lawyer shall withdraw from the representation of a client when:
>>(1) the lawyer knows or reasonably should know that the representation will result in a violation of these Rules or of law;
>>(4) the lawyer knows or reasonably should know that the client is bringing the legal action, conducting the defense, or asserting a position in the matter, or is otherwise having steps taken, merely for the purpose of harassing or maliciously injuring any person.

Section 3.3 states the following, in relevant part:

>*Conduct Before a Tribunal*

>>(b) A lawyer who represents a client before a tribunal and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.
>>(c) The duties stated in paragraphs (a) and (b) apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

An attorney might be subject to sanctions if he or she continued to assert baseless allegations after learning of the facts or legal precedent that undermined them. For instance, in *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 549 (5th Cir. 2001), the court affirmed sanctions in the form of reasonable attorney fees and expenses against an attorney who conducted 150 hours of investigation prior to filing suit but who continued to pursue the claim even after learning that claim was baseless. In *Childs v. State Farm Mutual Automobile Insurance Co.*, 29 F.3d 1018 (5th Cir. 1994), the court found that the plaintiff's attorney had conducted a reasonable investigation before filing an action against the insurance company on behalf of his client, who had been involved in a hit-and-run accident. The insurance company presented substantial evidence that the accident had been staged. The plaintiff's attorney then failed to conduct any discovery of his own into the insurance company's allegations. That failure to investigate or withdraw the claim led the district court to impose sanctions. The appellate court affirmed:

We must agree that this inquiry was deficient. [Defendant's] evidence of fraud was powerful, and yet, all of [the attorney's] investigative efforts can be summed up as asking [his client] and his alleged co-conspirators if they were frauds and reviewing the evidence. Never did [the attorney] conduct any affirmative discovery to test the veracity of the evidence developed by [defendant]. 29 F.3d at 1025.

"The question [as to whether a claim is colorable] is whether a reasonable attorney could have concluded that facts supporting the claim *might be established,* not whether such facts actually *had been established." Schlaifer Nance,* 194 F.3d at 337 (citation omitted). The circumstances here made it clear to Plaintiff's counsel, certainly by the summary judgment stage, that there was no reasonable chance any colorable claim "might be established." Even if Plaintiff's story could potentially have been believed before discovery, once the mountain of incriminating and contradictory evidence was revealed, then reasonable, ethical attorneys would have realized that they were being duped and moved to discontinue.

A red flag came immediately after the litigation started. When Plaintiff's counsel saw her extortionate February 9 email attached to Defendants' Answer as Exhibit A, accompanied by a clear pleading of criminality, this triggered a need for heightened diligence to verify that their client was telling them the truth. Had they immediately compared that version of the email to the version Plaintiff sent them on March 21, 2013, and seen that she had edited out the extortionate statements about dirty water, it would have been yet another red flag. Dkt. No. 8-22. The February 9 email's assertions about her having a lawyer at the time (which they personally knew to be false) and the threats to spread defamatory pictures (which they could see at a glance constituted an illegal act) should have led to a full-stop, and, at very least, a much deeper inquiry before pressing further.

Plaintiff's counsel's immediate due diligence would have included, at minimum, a real examination of their client's digital records. They would have seen that her emails about Nirvana were positive and her Facebook posts about it were innocuous. They would have seen the contradiction in the story about Plaintiff's becoming nauseous solely because of Mansur's sexual advances, in the

complaint Mr. Rose signed, when she later blamed her ex. They would have seen her agitation at having her job offer with Barrett Paving withdrawn, and her anger at "being let go" by Mansur in favor of someone else, rather than having quit.

Interviews with Francis Wilbert Rocker III, George Zehr, Leo Hellinger, or any number of Nirvana employees would have revealed Plaintiff's tendency to engage in explicit sexual behavior in front of her colleagues. Speaking with Plaintiff's supervisor (is this not mandatory diligence for a lawyer in an employment action?), Jeanie Hellinger, would have confirmed that she never complained about sexual harassment at work. Plaintiff's counsel must be asked whether they interviewed a single current Nirvana employee. Or even another former employee, apart from Ms. Mealus's best friend, who did not witness actionable conduct.

Then came the depositions. Kelly Flynn, identified by Plaintiff as a key witness, turned out to have made a single uneventful visit to Nirvana lasting a total of 5 minutes. Dkt. No. 38-17 at 29:12. Another, Alyssa Johnson, confirmed that Plaintiff had called the Rafizadehs "towel heads," and stated unequivocally that she witnessed no sexual harassment. Dkt. No. 38-19 at 8, 17. The extent of Heather Gorczyca's observation of Mansur's behavior toward Plaintiff was that he walked alongside her and touched her shoulder. Dkt. No. 68 at 17. Plaintiff herself lied about illegally buying drugs from her mother, had medical records that contradicted her claims, *id.* at 13-17, and concocted an absurd and perjurious story about her sister editing out the extortionate parts out of the February 9 email. Dkt. No. 38-3 at 180-89. Just as they swayed the Court, the contradictions and bad acts were too prevalent for counsel to reasonably believe that their client proceeded in good faith. Plaintiff's counsel came to Oneida County to depose Defendants, asking Mansur questions such as, "Have you ever paid for sex?", Dkt. No. 51 at 88:20, and "What does it mean to be a peasant?" (without explanation or context). *Id*. at 51:12. But they noticed no depositions of their own. Plaintiff's counsel did not issue a single subpoena in this case. Mr. Rose and Mr. Kennedy did not attend the depositions of Joyce Mealus, Julie Mealus

Nellenback, Kelly Flynn, or Alyssa Johnson, hiring several different local counsel instead. This is not objectionable in itself, but when two different local attorneys asked a grand total of one question over the course of four witness depositions, it was reasonable to infer that the attorneys who hired them had no real interest in what the witnesses had to say.

Plaintiff's counsel's sending in a response to our motion for summary judgment a week after the deadline, and failing to respond to Defendant Nirvana's motion at all, was representative of the amount of attention Plaintiff's counsel felt this case was worth. Dkt. Nos. 51-53. The lack of colorable evidence is why their submissions in opposition to summary judgment attempted to cover up the lack of factual support with invective (e.g. Mansur treated Plaintiff like "property," etc.). It is why they were forced to agree with Plaintiff's defamatory lie about Nirvana shipping dirty water in their response to our Statement of Material Facts, making a false and sanctionable representation to the Court. Dkt. No. 53 at ¶18.

If the extortionate nature of Plaintiff's behavior was not clear enough on its face, once the Oneida County District Attorney had charged Plaintiff with two misdemeanors stemming from her actions leading up to this litigation, Plaintiff's counsel was unequivocally on notice of the seriousness of Plaintiff's conduct, and should reasonably have known that this lawsuit was part of an illicit scheme. Ex. 3. At Plaintiff's unsuccessful motion to disqualify Defendant's counsel, Mr. Kennedy conceded what he should have done: "If there was a complaint brought in a parallel civil proceeding, what we would have done, had we known about it, is we would have asked the Court to stay the proceeding until a criminal action went forward, then we would proceed with the civil matter." Ex. 4 at 28:8-12. The problem with his explanation is, he *had* known about it. In response to questioning from the Court, Mr. Kennedy admitted that he had been on notice of the criminal complaint against Plaintiff since the Rule 16 conference in July of 2013:

"I do recall you asking Mr. Pertz, you know, had defendants reported Cherie Mealus to law enforcement and that counsel had said yes. My understanding at that time was that this is a complaint that didn't arise from counsel at all but this was a complaint that defendants of their own volition felt they had been a victim of a crime and had reported this crime in a timely fashion somewhere in 2012....[I]n fact, in the affirmative defense it was pled that the lawsuit itself was part of this scheme or plan to extort clients." Ex. 4 at 3:17-24.

Mr. Kennedy described his office's reaction to this information: "So we felt that was laughable on its face." *Id.* at 4:21-22.

Even if his initial explanation can be believed, when his client had actually been charged with crimes, why not do what he said he needed to do, and "[ask] the Court to stay the proceeding until a criminal action went forward, then...proceed with the civil matter"? What was stopping them from staying the proceeding then, possibly saving the Court from having to go through the exercise of ruling on Defendants' motions? Plaintiff's counsel knowingly and willfully ignored her criminal conduct. After the Rule 16 conference, they did not contact the District Attorney's office to inquire as to whether any investigation was in progress. They never contacted them to discover what it had revealed. They attempted to justify her conduct to the Court, arguing that the February 9 email was not extortionate "because the statements relating to water samples are never directly connected to any request for money." Dkt. No. 53 at ¶ 13. The Court correctly held that their argument was disingenuous at best. In fact, it is frivolous and sanctionable.

In addition to the pre-filing questions above, Plaintiff's counsel should be required to report the following:

6) which witnesses they interviewed over the course of the litigation;

7) what steps they took to investigate the information provided by Leo Hellinger, George Zehr and Francis Wilbert Rocker III as to Plaintiff's premeditated plan to blackmail the Rafizadehs with pictures of dirty water samples;

8) what investigation they did as to Plaintiff's email of February 9, 2012, and why it was

different from the email she sent them on March 21, 2012;

9) when they learned that Heather Gorczyca, the one witness they alleged supported Plaintiff's case, was Plaintiff's best friend and a convicted felon; and

10) what investigation they did to confirm or deny the allegation of criminality stated in Defendants' Answer.


In the response to our safe harbor letter, Plaintiff points to *Fuerst v. Fuerst*, 832 F. Supp. 2d 210 (E.D.N.Y. 2011), for the proposition that they were under no obligation to update their filings in the face of new information. The Court should be aware of the paragraph that follows the one Plaintiff cites:

> Nevertheless, "Rule 11 sanctions are appropriate where an attorney or party declines to withdraw a claim `upon an express request by his or her adversary after learning that [the claim] was groundless.'" *Carlton Group*, 2003 WL 21782650, at *7 (quoting *Calloway v. Marvel Entm't Group*, 854 F.2d 1452, 1472 (2d Cir.1988), *rev'd in part on other grounds*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989)); *see also O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 709 (2d Cir.1990) ("[C]ontinuing to press an obviously meritless lawsuit does tend to indicate bad faith and further supports the imposition of a rule 11 sanction."). 832 F. Supp. 2d at 220.

The *Fuerst* court went on to impose sanctions. Here, our safe harbor letter constituted the appropriate express request. Plaintiff presents misleading material, with this point as in the litigation as a whole.


### 3. Plaintiff's Counsel Abetted the Bad Faith Claim by Failing to Disclose Evidence

There is a difference between zealous advocacy and unethical behavior. The line is crossed when an attorney gains an advantage in the litigation by knowingly failing to disclose detrimental information. Section 3.4 of the Rules of Professional Conduct states the following, in relevant part:

> *Fairness to Opposing Party and Counsel*
> A lawyer shall not:
> (a) (1) suppress any evidence that the lawyer or the
> client has a legal obligation to reveal or produce;
>  (3) conceal or knowingly fail to disclose that which the

> lawyer is required by law to reveal;
>
> (4) knowingly use perjured testimony or false evidence.

Plaintiff's Facebook account was essential to Defendants' argument that the case deserved dismissal under *Jeffreys v. City of New York*. The Court cited this Facebook evidence several times in its decision. Knowing from our own investigation that Plaintiff used Facebook, and having seen some posts relating to her employment in her public profile, we made a discovery request for access to Plaintiff's Facebook account. Plaintiff's counsel denied the request. We requested access again, setting forth our entitlement to the discoverable evidence in a letter. Plaintiff's counsel again denied us. This time, Mr. Rose crossed the line: "I have personally looked through this account and found nothing related to Plaintiff's employment with Defendants or this pending lawsuit, and accordingly anything responsive to Defendants' requests." Dkt. No. 38-26 at 3.

Only when we revealed that we had evidence of Plaintiff's relevant Facebook activity from another source, threatening to expose Plaintiff's counsel's statement as false, and successfully moved the Court to compel the Facebook evidence, did counsel turn over a CD containing material from Plaintiff's Facebook account, at the return of the motion. Even then, we had to obtain the "towel heads" comment from a third party, as Plaintiff's counsel never disclosed it. *Compare* Dkt. No. 38-20 (from Ms. Johnson's Facebook page) *with* Dkt. No. 38-18 (listing material disclosed by Plaintiff).

Seen in the best possible light, Mr. Rose's representation that the Facebook treasure trove contained nothing of value would be grossly negligent. Running a word search for the term "Rafizadeh" but not "Mansur" (nor, "work," "job," "sex," etc.) might just be a simple lack of diligence. But it is confusing to hear Mr. Rose allege to have entered search terms such as "Nirvana," having failed to disclose any of the many Facebook posts that explicitly contained the word, "Nirvana." Dkt. No. 38-18; *compare* Ex. 2 at ¶ 6. It is more than unlikely that he could have "reviewed the profile around key dates," but a post on February 8, 2012, the day Ms. Mealus claimed to have been

constructively discharged from Nirvana, reading, "so some dumb bitch trouble maker started shit and i am not getting the job cuz of her" did not strike him as relevant. Dkt. No. 38-18 at 12. As if the content of Plaintiff's admission that "I was so upset that I got sick every day for 4 months" not because of Mansur but because of an ex, "ended it a little over a week ago and today for the first day in 4 months I did not throw up," were not eye-catching enough, Plaintiff ended it with all-caps and five exclamation points: "YAY ME!!!!!" Dkt. No 38-18 at 13. Frankly, given that the account was overloaded with material obviously devastating to his client's story, it is impossible that he could have spent any reasonable amount of time going through it and not found anything remotely relevant whatsoever. Given the centrality of a digital record to the case, Plaintiff's prior alteration of a digital record (and ultimate willingness to lie about the alteration under oath), and our repeated requests for the evidence, special care was required when examining her electronic records. Instead, Plaintiff's counsel took special care to keep them hidden.

There is no reason to believe that Mr. Rose or Mr. Kennedy personally bore any ill will toward Mansur or Mozafar. But they did serious damage to them. Plaintiff's counsel "multiplie[d] the proceedings" by forcing the Rafizadehs to defend this extortionate lawsuit, well past when it should have been discontinued. They demanded over $2 million dollars, threatening to cripple a business they had never bothered to visit and which employed people they had never bothered to contact. In the face of overwhelming evidence that a client who came to their referrer through the internet was untruthful and malicious, their inaction became tantamount to condoning her bad faith. And their allowing the concealment of dispositive evidence advanced her scheme beyond any reasonable boundaries of professional ethics.

## **CONCLUSION**

"[A] court should discipline those who harass their opponents and waste judicial resources by abusing the legal process." *Schlaifer Nance,* 194 F.3d at 341. This conduct at issue here undermines the

dignity of the federal courts. At the end of a bad-faith lawsuit, the message cannot be that misconduct

has no consequences. Cherie Mealus brought this lawsuit out of desperation and her lawyers pursued it

out of reckless indifference. If they can walk away with nothing but a losing lottery ticket, what is to

stop them from doing this again? The next time Plaintiff's counsel becomes aware of potential

criminality, what is to convince them to take it seriously? What is to compel them to investigate the

next story they are told before costing someone tens of thousands of dollars in legal fees, sleepless

nights, and being forced to answer questions about their sex lives under oath? Defendant respectfully

asks for sanctions, along with such further relief as the Court deems just and proper.


Dated:          October 15, 2014                                    Respectfully submitted,




Richard Pertz, Esq.
Bar Roll No. 102357
12280 State Route 365
Remsen, NY 13438
(315) 732-4900
rpertz@gmail.com

TO:

JESSE C. ROSE, ESQ.
Attorney for Plaintiff Cherie Mealus
Phillips & Associates, Attorneys At Law, PLLC
45 Broadway, Suite 620
New York, NY, 10006
Tel: 212-248-7431

ROBERT F. JULIAN, ESQ.
Attorney for Nirvana Spring Water N.Y. Inc.
2037 Genesee St.
Utica, NY 13501
315-797-5610
Robert@rfjulian.com